Charles Troy COLEMAN, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-79-600.

Court of Criminal Appeals of Oklahoma.

July 11, 1983.

Rehearing Denied Sept. 19, 1983.

As Corrected Sept. 19, 1983.

D.D. Hayes, Muskogee, for appellant.

Jan Eric Cartwright, Atty. Gen., Dena L. Bates, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BUSSEY, Presiding Judge:

Charles Troy Coleman was convicted of Murder in the First Degree, in Muskogee County District Court, Case No. CRF–79–76. In the second stage of the trial, pursuant to 21 O.S.1981, § 701.10, the jury assessed the death penalty.

At approximately 4:15 p.m. on February 9, 1979, John Seward was found in the basement of his sister's home, dead as a result of a single shotgun wound to the back of his head. His wife, Roxie Seward, was found next to him, dead as a result of four shotgun wounds inflicted from only inches away. Determined to be missing from the home of Mr. and Mrs. B.L. Warren were the Seward's wallets, Mrs. Warren's turquoise watch, packages of frozen meat stamped "Hogle, Not for Sale," and various other food items.

Later that same day, shortly after 6:00 p.m., the defendant was stopped and arrested for traffic violations. A search of the camper pickup truck he was driving revealed the Seward's wallets, the packaged meat and other various food items, which were subsequently identified by Mrs. Warren at trial as being from her pantry.

## I.

In his first assignment of error, the defendant alleges that the trial court erred in failing to suppress all evidence obtained as a result of the warrantless search of his pickup truck. Specifically, the defendant alleges the following: That the warrantless search was not justifiable as incident to an arrest for a traffic offense; that his vehicle was illegally impounded on private property; that the alleged inventory search was a subterfuge; and that there was no consent to search the vehicle.

At approximately 6:00 p.m. on the afternoon in question, Officer Ralph Rose, an off-duty dispatcher for the Wagoner County Sheriff's Department, motioned at the defendant for speeding and passing in a no passing zone, by shaking his finger at him as he passed. Officer Rose testified that Coleman pulled his pickup truck to the side of the road, and a conversation ensued which culminated when Coleman got back into his vehicle. As the defendant departed at a high rate of speed, Officer Rose testified that he observed the passenger in the defendant's truck drinking a beer. Rose turned on his red lights and pursued the defendant at speeds up to 100 miles per hour. With the assistance of Highway Patrol Trooper Glen Smithson and Wagoner County Sheriff Tommy Gilbert, Officer Rose stopped the defendant's vehicle and placed him under arrest for various traffic violations and possible driving under the influence of intoxicating liquor. Since Officer Rose observed the defendant speeding, passing in a no passing zone, attempting to elude an officer and exhibiting intoxicated behavior, he had probable cause to arrest Coleman, pursuant to 22 O.S.1981, § 196, for committing misdemeanors in his presence. Thus, Coleman's initial arrest was proper and valid.

The defendant relies upon *Lee v. State*, 628 P.2d 1172 (Okl.Cr.1981) and *Kelly v. State*, 607 P.2d 706 (Okl.Cr.1980), to support his argument that his vehicle was on private property and therefore the law enforcement officers were without authority to impound it without a request by the property owner. We are of the opinion that the facts in the instant case are distinguishable from the facts in *Lee*, supra, and *Kelly*, supra. In the instant case the vehicle in question was involved in a high speed, hot pursuit chase which ended only when the defendant pulled into a residential driveway and stopped.

Coleman initially contended that he lived at the residence; however, Sheriff Gilbert was personally acquainted with the people who owned the property, and knew that neither the defendant nor others whom he subsequently claimed to be visiting lived there. It was obvious to the officers that the defendant had merely driven his vehicle into the residential driveway to seek sanctuary. From Sheriff Gilbert's association with the actual residents and the presence of perishable foodstuffs in plain view in the truck's camper, it was apparent that the vehicle would have to be removed from the property. Coleman was in custody; his companion who had been observed drinking beer was properly forbidden to drive the vehicle; and, the defendant was unable to make other arrangements for the safekeeping of his belongings. We are of the opinion that the officers acted properly when they impounded the defendant's vehicle for the purpose of caretaking the defendant's property in accordance with *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

Trooper Smithson testified that he handed an inventory sheet to Officer Rose and instructed him to inventory the truck while he and Sheriff Gilbert transported the Colemans to the Wagoner County Jail. Furthermore, the trooper stated that while taking the defendant into custody, he had observed, in plain view, open wallets in the truck's glove compartment bearing the names "Seward," and a box of frozen meat stamped "Hogle, Not for Sale," in the truck's camper, and that he routinely questioned Coleman about them. In route to Wagoner, his investigatory instincts having been aroused, Trooper Smithson radioed the scene of the ongoing homicide investigation in Muskogee County and inquired whether

the victims' names were "Seward" and if meat stamped "Hogle, Not for Sale," had been taken. Upon receiving an affirmative reply, Trooper Smithson immediately stopped his cruiser, handcuffed Jeanette, read both Colemans their *Miranda* rights, turned his vehicle around and transported the Colemans to the Muskogee County Jail.

Officer Rose stated that pursuant to a radio communication from Trooper Smithson, informing him that the Colemans had been arrested as suspects in the Muskogee murders, he stopped his inventory, without having written anything on the inventory sheet, and waited for homicide investigators to arrive.

Both Officer Rose and Trooper Smithson testified that the inventory initiated at the time of the defendant and his passenger's arrest was pursuant to established departmental policy. As stated above, the wallets, the meat marked "Hogle, Not For Sale" and the other foodstuffs were all found during the initial stages of the inventory. The fact that neither Officer Rose nor the other officers had yet to reduce the findings of their inventory to writing is immaterial. The record discloses the good faith in which the inventory was initiated. It was only the sudden focus upon the defendant as a murder suspect which prevented completion of the list.

■ Although Agent Chrisco may have had time to arrange for a search warrant to be obtained while the pickup was being towed to Muskogee, we need not reach the issue of the appropriateness of his actions. The evidence complained of had previously been legally discovered, and was properly in police custody by virtue of the impoundment of the vehicle and the contents thereof. *Swain v. State,* 621 P.2d 1181 (Okl.Cr. 1980); *South Dakota v. Opperman, supra.*[1]

Thus, we find that the arrest of the defendant and the subsequent impoundment and inventory of his vehicle were proper, and the evidence of which the defendant now complains was properly admitted. This assignment of error is without merit.

## II.

In his second assignment of error, the defendant alleges that the trial court erred in failing to exclude statements made by him at the time of his arrest, because he did not immediately receive the *Miranda* warnings. Defendant complains of three separate incidents in which Officer Smithson testified that the defendant made inculpatory statements to questions regarding the wallets, groceries, and the defendant's reasons for stopping at the residence where he was arrested.[2]

1. During Agent Chrisco's testimony at the defendant's trial, a list of items taken from the appellant's truck after it had been towed to the garage was introduced. We do not find Officer Chrisco's testimony to constitute error, since he simply enumerated the items which had already been discovered.

2. Specifically the defendant complains of the testimony by Officer Smithson as follows:
 OFFICER SMITHSON:
 A. I—uh, went back and asked Mr. Coleman if—what his last name was and he told me. And I asked him what his in-laws' name was, and he told me that, and I don't remember what his in-laws' name—what he said they were, but it was not Seward. And, at that point, I went over and asked Mrs. Coleman the same questions, and neither of her answers were Seward either. So, I went back then and asked, Mr. Coleman where he had got the wallet. And he told me he had been to the Eight-Ball the night before, which is a Club in Muskogee, and he said that he

had picked up a woman and her husband there who were having an argument and they had pickup trouble and they gave them a ride home. He said, apparently, she had left her wallet in the pickup and about this time Sheriff Gilbert and Ralph Rose was in the rear of the vehicle looking in it and they had discovered some groceries and meat and stuff in it and they called me over to look at it, and on the meat it had a name stamped HOGLE, and it was processed meat, and it had NOT FOR SALE stamped on it. I went back and asked Mr. Coleman about this and he told me that they had been to the Warehouse Market to buy groceries and he said that they bought their groceries there. I asked him if he bought all of them there, and he said: Yes, we bought all of our groceries at the Warehouse Market. And, at this time I asked him, or I told him that he could not buy the meat there. And I asked him: Where did you get the meat that's stamped NOT FOR SALE? You can't buy it at Warehouse Market. He told me that apparently

■ We initially note that the defendant failed to object to Trooper Smithson's testimony at the time it was offered at trial. This Court has consistently held that when no specific objections are made at trial to the admission of a defendant's inculpatory statements, such objections cannot later be made as assignments of error on appeal. *Long v. State,* 567 P.2d 110 (Okl.Cr.1977). See also, *U.S. v. Holliday,* 474 F.2d 320 (10th Cir.1973).

In addition, the defendant did not include this assignment of error in his motion for new trial nor in his petition in error, and has not properly preserved this assignment of error for review. *Hawkins v. State,* 569 P.2d 490 (Okl.Cr.1977); *Chronister v. State,* 538 P.2d 215 (Okl.Cr.1975).

■ Furthermore, even if the alleged error had been properly preserved for review, we are of the opinion, after having carefully reviewed the record before us, that the questions asked of the defendant were purely investigatory in nature, and were not accusatory. The law enforcement officer who asked the questions had no inkling that Coleman had been involved in a homicide, at the time the questions were asked; thus, it cannot be said that the purpose of the questioning was to elicit a confession. The defendant was arrested for traffic violations and possible D.U.I., and it was not until Trooper Smithson called the homicide scene, while in route to the Wagoner County Jail, that the defendant became the "focus" of a homicide investigation, and he was immediately read his *Miranda* rights warning at that time. See, *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Thus, we are of the opinion that the questioning was not improper.

■ Moreover, even if the questioning had been improper, it is well established that the admission of statements obtained in violation of *Miranda* may be said to constitute harmless error.[3] *Harryman v. Estelle,* 616 F.2d 870 (5th Cir.1980), cert. denied 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In determining whether the harmless error rule is applicable, we must determine whether, absent the unconstitutional defect, "the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt." *Chapman,* supra.

■ A review of the record reveals that evidence of Coleman's guilt, although circumstantial, was overwhelming. The fact that the statements were admitted had no effect on the other substantial evidence introduced against Coleman at trial. As discussed in the first assignment of error, the Sewards' wallets and the Warrens' meat and groceries, were discovered, pursuant to a valid search, in the defendant's pickup only two hours after the homicides. Also,

the meat was left in the vehicle, also, from the night before cause the people had left meat in there when they took them home. He said: 'We were all very drunk. Didn't know what we were doing.'

\* \* \* \* \* \*

OFFICER SMITHSON:
A. This is a picture of the groceries and frozen meat items that were also found in the rear of the pickup. I asked him about it, and he stated he had bought it at Warehouse Market.
MR. TURPEN:
Q. And he later stated what?
A. He later stated that it belonged to the people that he had picked up at the Eight-Ball.
MR. TURPEN:
Q. The night before?
A. Yes, sir.

\* \* \* \* \* \*

A. Okay. About that residence. Did you ever inquire as to why they stopped there?
A. Yes, I did. I asked Mr. Coleman why they had stopped at this residence. He said: We live here. And I asked his wife later the same question. She verified—
MR. PEARSON: Asked who later? I'm sorry.
A. His wife. And she verified it. I asked them if they had a key to the residence? They said: 'No.' And later Mr. Coleman said: 'It's a friend of ours house' and he called the friend's name. I don't remember what the name was. Sheriff Gilbert was there. He knew who lived there, who had built the house, and he stated that was not the name of the people that owned the house.

3. The record in this case reflects no evidence that defendant's statement was involuntary.

at the time of his arrest, approximately $210.00 in cash and a $2.00 bill were found in the defendant's shirt pocket. Mrs. Warren, the victim's sister, testified that her brother carried large sums of money and a $2.00 bill for good luck in his wallet. At trial, two witnesses identified the defendant's white camper pickup truck as being similar to a white camper pickup they had seen in front of the Warrens' residence at the approximate time of the homicides. Jeanette Coleman, the defendant's "alleged common law wife," testified that at approximately 3:30 on the afternoon of February 9, 1979, the defendant left their residence with a shotgun and shells and returned at approximately 4:15. Defendant's brother, Vernon Dale Coleman, Sr., testified that after the defendant's arrest on the evening of February 9, he retrieved a .28 gauge shotgun (State's Exhibit No. 19) and a box of Federal brand, No. 6 load shotgun shells from the defendant's residence and conveyed the evidence to Muskogee County Investigator Gary Sturm between February 10 and February 11, 1979. Tom Jordan, a ballistics specialist, testified that State's Exhibit No. 19 was an uncommon gauge and brand of shotgun and was consistent with the weapon and ammunition used in the Seward homicides. Finally, Eli Maghee, who was incarcerated with Coleman prior to trial, testified that the defendant recounted the details of the homicides and explained the reasons for the murders as being that, "you just don't leave any witnesses cause you got a lot less chance of getting convicted."

Further, the defendant does not allege that the admission of the statements precluded him from introducing exculpatory evidence or hindered his defense in any manner.[4] The second assignment of error is without merit.

### III.

In his third assignment of error, the defendant argues that the trial court erred by admitting, over objection, allegedly prejudicial photographs. Specifically, Coleman complains of State's Exhibits No. 12F and 12I, which were black and white photographs of the murder victims taken at the scene of the homicides, and State's Exhibit No. 18A, which was a color photograph taken before the autopsy depicting the entrance wound in the back of the victim's head.

We are of the opinion that in accordance with the test set forth in *Oxendine v. State,* 335 P.2d 940 (Okl.Cr.1958), the probative value of the evidence in question outweighs any prejudicial effect. See also, *Glidewell v. State,* 626 P.2d 1351 (Okl.Cr. 1981). In the instant case, the photographs of the victims at the scene of the crime tend to show that the victims were killed in an execution type manner in the basement. Also, the photograph of the entry wound in the back of the victim's head corroborates the ballistics expert's testimony and the pathologist's testimony that the shotgun was fired at point blank range. These photographs show definitely that the intent was to kill.

Finally, the admission of allegedly gruesome photographs is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Glidewell v. State,* supra. We note that the trial court excluded several other photographs for their prejudicial effect and determined that Exhibits 12F, 12I and 18A were probative and admissible. This assignment of error is without merit.

### IV.

In his fourth assignment of error, the defendant alleges that the trial court erred by allowing Jeanette Coleman, the defendant's alleged common law wife,[5] to testify.

4. Defendant's defense was that he did not have time to commit the murder; that Eli Maghee had a reputation of being untruthful and that his sister-in-law had given him $400 in cash the week of the homicides.

5. The trial court ruled that Jeanette Coleman was the common law wife of the defendant's older brother Abe Coleman, whom she had not divorced; therefore, she could not be the defendant's common law wife.

He contends that her testimony violates the husband/wife privilege under 22 O.S.1981, § 702 and 12 O.S.1981, § 2504. In *Lavicky v. State,* 632 P.2d 1234 (Okl.Cr.1981), we said that although 22 O.S.1981, § 702 has not been specifically repealed, the legislature intended that 12 O.S.1981, § 2504 supercede all prior legislation on the subject. Accordingly, the statute to apply in the present case is 12 O.S.1981, § 2504 which provides in pertinent part:

A. A communication is confidential for purposes of this section if it is made privately by any person to his spouse and is not intended for disclosure to any person.

B. An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse.

At trial, Jeanette Coleman testified in regard to the events of the day of the homicide. Our initial inquiry is whether her testimony breached any confidential communications.

■ Jeanette testified that on the day of the homicide, the defendant came home at approximately 3:30, retrieved a shotgun and shells from their bedroom, left in his white camper pickup, and returned at approximately 4:15 p.m. We are of the opinion that this testimony did not concern a privileged communication. The privilege does not extend to matters learned through observation of the spouse's non-communicative acts which are not intended to be confidential. See, *Moore v. State,* 270 Ark. 592, 605 S.W.2d 445 (Ark.1980); *State v. Benner,* 284 A.2d 91 (Me.1971). In the instant case, the defendant had been hunting earlier that day and therefore Jeanette's suspicions weren't aroused when he left for the second time with the shotgun. It is clear that the defendant's conduct occurred without any intent by him that his conduct be kept confidential. *State v. Benner,* supra.

■ Jeanette also testified that, prior to going grocery shopping the defendant stated that they owned the groceries in the back of the camper. Finally, she stated that at the scene of their arrest, the defendant gave her a turquoise watch to keep, and then requested she give it back when they were being transported to Muskogee. We are of the opinion that this testimony also did not breach any confidential communications. Communications are not confidential if made in the presence of third parties. *Lavicky v. State,* supra. Since these statements of the defendant, to which Jeanette testified, were made in the presence of third parties, his contention is without merit. Accordingly, this assignment of error is also without merit.

## V.

In his fifth assignment of error, Coleman contends that the trial court committed reversible error by admitting evidence of his escape from the county jail, evidence of the burglary of the Warren residence and evidence of the murder of Roxie Seward.

■ We initially find, from a review of the record, that the State complied with procedures necessary to introduce evidence of other crimes, as set forth by *Burks v. State,* 594 P.2d 771 (Okl.Cr.1979). The State furnished the defendant with written notice, ten days before trial,[6] of its intent to introduce evidence of the escape, burglary and murder. In the notice of intent to introduce evidence of other crimes, and at the time the evidence was offered, the prosecutor specified the exception under which the evidence was sought to be admitted.[7] Additionally, the trial court gave the jury a limiting instruction regarding evidence of other crimes. Further, it is well established that evidence of an escape from custody by an accused is admissible as showing consciousness of guilt. *Odum v. State,* 651 P.2d 703 (Okl.Cr.1982). See also, *Brinlee v.*

---

**6.** The State filed a notice of intent to offer evidence of other crimes on August 27, 1979, and trial began on September 25, 1979.

**7.** The State advised that the evidence was offered as an exception to other crimes evidence based on res gestae as well as proof of identity of the defendant and defendant's intent to kill.

*State,* 608 F.2d 839, 10th Cir.1979, cert. denied 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980).

■ Finally, we note that the burglary of the Warren residence and the murder of Roxie Seward can be considered to be a part of the res gestae of the murder of John Seward. *Burks v. State,* supra. The burglary and murder were committed contemporaneously with the murder of John Seward and were inseparable parts of a single criminal episode; the charges should have been filed in a single information, listing the various counts. See, *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980). We find no merit in the defendant's fifth assignment of error.

## VI.

■ In his sixth assignment of error, the defendant argues that he was denied a fair trial by reason of the district attorney's improper and inflammatory remarks made during closing argument. We initially note that although defense counsel moved for a mistrial based on improper prosecutorial remarks at the conclusion of State's argument, he did not interpose an objection to any of the statements during the course of closing argument. Since no objection was made at the time the alleged prejudicial statements were made, nor was any request made for an admonishment to the jury regarding them, the error has not been properly preserved for review. *Smith v. State,* 594 P.2d 784 (Okl.Cr.1979). Although defense counsel failed to object to the numerous instances of alleged prosecutorial misconduct, we shall review the record for fundamental error. *Cobbs v. State,* 629 P.2d 368 (Okl.Cr.1981).

■ While some of the remarks were unnecessary and are not to be condoned,[8] they were not so grossly improper, in light of the evidence presented, as to have affected the verdict of the jury; thus, no modification or reversal is required. See, *Chaney v. State,* supra.

## VII.

In his seventh assignment of error, the defendant alleges that reversible error occurred at trial by reason of the prosecutor's knowing use of perjured testimony. Prosecution witness, Eli Maghee, was incarcerated with the defendant during the summer of 1979, and testified as to conversations he had with Coleman.

8. The transcript reads in part as follows:

Folks, what do we talk about when we talk about First Degree Murder? We're talking about—we're talking about this man's head! I don't mean to be shocking, ladies and gentlemen of the Jury, but we're talking about this man's head being turned into a puddle of blood and gray hairs at the bottom of the stairs. That's the reality of it. I'm not trying to shock anybody. That's the reality of it. That a living human being's head was turned into a puddle of blood and hair because of him, based on the evidence. (Tr. 787).

\* \* \* \* \* \*

But I want you to think about the last few seconds in John Seward's life as he's being marched down those stairs with his wife, you know, to what became a human slaughter house, and think about the horror he must have felt. And think about the terror he must have felt as he spent his last few seconds on this earth—a man who, I suggest to you, had the right to die with more dignity. Let's think about it. (Tr. 788).

\* \* \* \* \* \*

Last witness. Mrs. Warren. Mrs. Warren described this—the home she lived in here—that's where she lives. It's nice to live in a home where your brother was murdered in the back basement. Think about that, please.

John Seward is dead and gone forever. Plus, there's more than one victim. We all suffer a little, but think of the family that's still living in the home and where her brother was murdered in the basement. See, it points out that there's more than one victim when it comes to cold-blooded murder. When a man does what this man did, Charles Coleman, on that day, February 9th, when he takes them down into the basement of the home and murders them in cold-blood, if you will, when you do that, you see you got more than one victim. You've got more than just Roxie and John Seward, you see, you got a family. You got people left behind. See, this was a pretty expensive shopping spree. I mean, a lot of people have suffered, if you know what I mean, based on the evidence, I mean, from the witness stand, that Mrs. Warren testified about. (Tr. 830).

Citing 21 O.S.1981, § 496, the defendant alleges a discrepancy exists between witness Maghee's testimony at the defendant's preliminary hearing in Tulsa County for the murder of Russell Lewis and Maghee's testimony at the trial in Muskogee County for the murder of John Seward, because at the preliminary hearing in Tulsa Maghee did not testify as to his conversations with the defendant regarding the murders of the Sewards in Muskogee County.

A review of the preliminary hearing transcript from the Tulsa County case reveals that there was no questioning by the State's counsel on the subject of the Seward murders. Obviously, the omission of testimony lacks an essential element of perjury. See, *Holt v. State*, 506 P.2d 561 (Okl.Cr.1973).

Further, at trial in the present case, the defense counsel had ample opportunity to cross-examine witness Maghee concerning any inconsistent statements which he might have given. *Taylor v. State*, 555 P.2d 1073 (Okl.Cr.1976). The jury was properly instructed in regard to the weight and credibility to be given the testimony of any witness. We find this assignment of error to be without merit.

### VIII.

In his eighth assignment of error, the defendant alleges that he should have received a preliminary hearing on the bill of particulars. Specifically, he argues that since a preliminary hearing is required in all after former conviction of a felony (AFCF) cases, the same requirement should be had in capital cases. We have recently rejected this argument in *Brewer v. State*, 650 P.2d 54 (Okl.Cr.1982). In *Brewer*, supra, we stated that 21 O.S.1981, § 701.9 apprises the defendant of all possible penalties he faces. In addition, 21 O.S.1981, § 701.10 specifically states that "only such evidence in aggravation as the State has made known to the defendant prior to his

trial shall be admissible." These procedures eliminate any element of surprise; therefore, this assignment of error is without merit.

### IX.

In his ninth assignment of error, the defendant alleges that the trial court improperly admitted evidence in the second stage which was not previously made known to him. In support of his argument he cites 21 O.S.1981, § 701.10, and alleges that he did not receive notice in the Bill of Particulars that the State intended to introduce evidence that he kidnapped an Arizona highway patrolman after his escape from county jail.

The Bill of Particulars contained the following pertinent language:

5. That there exists a probability that the defendant Charles Troy Coleman will commit future criminal acts of violence that will constitute a continuing threat to society, based on the following:

\* \* \* \* \* \*

On the 23rd day of April, 1979, after the defendant had been bound over for trial for the murders of John and Roxie Seward, and it appearing that he would be held accountable for these two deaths and would be taken to trial for the commission of the murders, he did then and there escape from lawful confinement in the Muskogee County jail, fleeing beyond the borders of the State of Oklahoma, further illustrating his contempt and total disregard for the rules of a structured and orderly society and creating a further danger to other lives, including those of the law abiding citizens of this state, and in other areas of this nation; . . .

We are of the opinion that the defendant did receive sufficient notice of the evidence which the State intended to introduce in support of the aggravating circumstance.[9] The Bill of Particulars is specific in its

---

9. The aggravating circumstance is found in 21 O.S.1981, § 701.12.2 which provides in part:
 Aggravating circumstances shall be:
 \* \* \* \* \* \*

7. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; or . . .

allegation of defendant's escape from the county jail, and the defendant kidnapped the Arizona highway patrolman on the five day spree subsequent to his escape. Furthermore, the defendant was made aware of the evidence because the Arizona highway patrolman had testified to the details of the kidnapping at the preliminary hearing in the Tulsa County murder, a transcript of which had been provided defense counsel. In *Chaney v. State,* supra, we said that 21 O.S.1981, § 701.10 is designed to give the defendant appropriate notice of the evidence of aggravating circumstance(s). We are of the opinion that in the instant case the State complied with this requirement. Accordingly, this assignment of error is without merit.

### X.

 In his tenth assignment of error, the defendant complains that four prospective jurors were excused for cause in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Chaney v. State,* supra, we said:

> In *Witherspoon,* the Supreme Court held that persons cannot be excused from jury service for cause just because they are opposed to the death penalty. They can be excused for cause if their views are so strong that they would refuse to return a verdict of guilty, where it was justified, because the defendant could be sentenced to death. Prospective jurors can also be excused for cause if they have decided in advance that they will not vote to impose the death penalty, regardless of the circumstances. However, the questioning in this area during voir dire cannot be too specific:
>
> '. . . The most that can be demanded of a venireman . . . is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to

*vote* against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings . . .' (Emphasis original).

In the instant case, we believe that it was proper to excuse the jurors for cause. All four jurors stated unequivocally that they would not impose the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.[10] See also, *Parks v. State,* 651 P.2d 686 (Okl.Cr.1982). We therefore find this assignment of error to be without merit.

### XI.

 In the final assignment of error, the defendant alleges that three of the convictions relied upon to establish the aggravating circumstance were void and therefore the sentence of death should not have been imposed. At trial, an authenticated copy of the minute entries from the District Court Clerk of Elmore County of the State of Alabama, which reflect the defendant's convictions in three cases, was admitted as evidence of his prior conviction of a felony involving the use or threat of violence.[11] Defendant argues that these convictions are void because they do not show on their face that he knowingly and voluntarily waived his federal constitutional rights before entering a guilty plea. However, the record does indicate that he was represented by counsel upon entering his pleas of guilty. See, *Burgett v. Texas,* 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967). The record also reveals that an appeal was never perfected from the 1967 convictions. Defendant has not alleged that there are pending collateral attacks on the convictions through post-conviction relief. See, *State v. Jordan,* 126 Ariz. 283, 614 P.2d 825 (Ariz.1980). We are of the opinion that the Alabama convictions were properly introduced. See, *Ashlock v. State,* 643 P.2d 324 (Okl.Cr.1982). Further,

---

10. Defendant objected to the following jurors being excused for cause:
Juror Geisinger;
Juror Barnes;
Juror Halpain;
Juror Crager.

11. 21 O.S.1981, § 701.12 provides that:
Aggravating circumstances shall be:
(1) The defendant was previously convicted of a felony involving the use or threat of violence to the person.

the State introduced another 1973 conviction [12] from the Superior Court of San Luis Obispo County in the State of California, which supports the aggravating circumstance that he was convicted of a prior felony involving the use or threat of violence. Defendant's final assignment of error is without merit.

## XII.

 Pursuant to our statutorily imposed duty under 21 O.S.1981, § 701.13, we now hold:

1) The sentence of death was not imposed "under the influence of passion, prejudice or any other arbitrary factor." This was indeed a merciless execution of two innocent people who intruded upon the defendant as he burglarized a home. However, a complete review of the record reveals that the trial court was sensitive to the nature of the case and that defendant's attorney competently protected his constitutional rights. We are of the opinion that the defendant received a fair and impartial trial;

2) The evidence supports the jury's finding of statutory aggravating circumstances as enumerated in Section 701.12.

The basis for this holding should be clear from the body of this opinion.[13]

3) We have made a comparison of this case with other first degree murder cases before this Court and we find that the death penalty is not excessive.[14] The jury found five aggravating circumstances present in the instant case. We find that the evidence supports all five aggravating circumstances. We find no reason to disturb or modify the imposition of the death sentence.

Accordingly, the judgment and sentence is AFFIRMED.

CORNISH and BRETT, JJ., concur.

---

**12.** Defendant has not challenged the validity of this conviction.

**13.** The jury found that the evidence supported the following five circumstances: 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the defendant knowingly created a risk of death to more than one person; 3) the murder was especially heinous, atrocious or cruel; 4) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; 5) the existence of probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

**14.** We have compared this case with cases in which the defendant received the penalty of death:

Stafford v. State, 665 P.2d 1205 (Okl.Cr. 1983); Davis v. State, 665 P.2d 1186 (Okl. Cr.1983); Ake v. State, 663 P.2d 1 (Okl. Cr.1983); Smith v. State, 659 P.2d 330 (Okl.Cr.1980); Parks v. State, 651 P.2d 686 (Okl.Cr.1982); Jones v. State, 648 P.2d 1251

(Okl.Cr.1982); Hays v. State, 617 P.2d 233 (Okl.Cr.1980); Eddings v. State, 616 P.2d 1159 (Okl.Cr.1980) (Remanded for resentencing, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1), Chaney v. State, 612 P.2d 269 (Okl.Cr.1980).

We have also compared Coleman's sentence in light of cases in which death sentences have been modified to life imprisonment: Glidewell v. State, 663 P.2d 738 (Okl.Cr.1983); Johnson v. State, 662 P.2d 687 (Okl.Cr.1983) (53 OBAJ 730, Okl.Cr.1982; opinion withdrawn); Boutwell v. State, 659 P.2d 322 (Okl.Cr.1983); Driskell v. State, 659 P.2d 343 (Okl.Cr.1983); Jones v. State, 660 P.2d 634 (Okl.Cr.1983); Munn v. State, 658 P.2d 482 (Okl.Cr.1983); Odum v. State, 651 P.2d 703 (Okl.Cr.1982); Burrows v. State, 640 P.2d 533 (Okl.Cr.1982); Franks v. State, 636 P.2d 361 (Okl.Cr.1981); Irvin v. State, 617 P.2d 588 (Okl.Cr.1980).

We have also considered this case in light of cases in which the defendant's convictions and sentences of death were reversed or otherwise remanded for subsequent proceedings: Hatch v. State, 662 P.2d 1377 (Okl.Cr.1983); Hall v. State, 650 P.2d 893 (Okl.Cr.1982); Brewer v. State, 650 P.2d 54 (Okl.Cr.1982); Hager v. State, 612 P.2d 1369 (Okl.Cr.1980).