William Thomas **CARTWRIGHT, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F-82-758.**

Court of Criminal Appeals of Oklahoma.

Jan. 7, 1985.

Rehearing Denied March 8, 1985.

E. Alvin Schay, Appellate Public Defender, Norman, for appellant.

Michael C. Turpen, Atty. Gen., John O. Walton, Asst. Atty. Gen., State of Okl., Oklahoma City, for appellee.

## OPINION

BUSSEY, Presiding Judge:

William Thomas Cartwright was charged in the District Court of Muskogee County, Oklahoma, for the crimes of Murder in the First Degree, and Shooting with Intent to Kill, Case No. CRF–82–192. He was granted a change of venue to Cherokee County, Oklahoma. The jury before which he was tried returned verdicts of guilt on both counts, sentenced him to death for the murder, and to a term of seventy-five years' imprisonment for the shooting. He was sentenced accordingly.

The appellant began working for the victims in this case, Hugh and Charma Riddle, in their Muskogee remodeling business in July of 1981. His employment was terminated in December of that year. According to the appellant, he was fired because he demanded the Riddles pay for an injury he allegedly received on the job. According to Charma Riddle, he was laid off because of lack of business.

The appellant moved to Las Vegas, Nevada in January of 1982. He returned to Muskogee in late April, supposedly believing his claim against the Riddles for injury would be settled. He told a Muskogee acquaintance that he intended to "get even" with the Riddles.

On May 3, 1982, Hugh and Charma Riddle spent the night with Charma's father in Muskogee. They did not return to their rural Muskogee home until the early evening hours of May 4. They ate their evening meal and retired to watch television. As Charma made her way to the bathroom from the living room, she was confronted by a man in her hallway with a shotgun. She grabbed the gun, and the man fired it into her leg. After she fell, she saw her assailant and recognized him as the appellant. He shot her again.

Charma then saw the appellant walk into the living room where Hugh was. She saw the appellant fire two blasts from the shotgun, and heard her husband scream.

The appellant disappeared into the living room, and Charma dragged herself down the hall into a bedroom. She tried to use the telephone, but it was dead. She then began to write her assailant's name on the bedsheet in her blood. She managed to spell the letters TOM CAR.

The appellant entered the bedroom. Charma asked him why he had shot them, and he replied that they should not have fired him. Charma then asked the appellant to help her. The appellant slit her throat and stabbed her with the hunting knife the Riddles had given him for Christmas.

Miraculously still alive, Charma heard the telephone ring in another room. She deduced that the telephone she had tried to use earlier was only unplugged. She plugged it in and called an operator, who contacted the Muskogee police department. She told the police dispatcher that Tom

Cartwright had shot her, and that he was still in the house.

Pursuant to the directions Charma gave, Muskogee County Sheriff's officers and Muskogee police officers arrived at the house. The first officer who arrived observed a man standing outside the Riddle home. The man dodged between trees before disappearing into the darkness. A subsequent search for him was fruitless.

Clothing, weapons and other possessions belonging to the Riddles were found inside their vehicle. Found along with those articles was a silver jacket which was identified as being similar or identical to one the appellant owned.

The officers found the body of Hugh Riddle lying face down in the living room inside the Riddle home. Charma was still in the bedroom. She was taken by ambulance to the Muskogee Hospital. She lived to testify against the appellant at trial.

Two days after the murder/shooting (May 6, 1982), the appellant called his sister from a pay telephone in Muskogee. The sister picked him up, fed him, gave him a change of clothes and called the Muskogee County District Attorney. The District Attorney came to the sister's house, and got the appellant. The appellant was taken to jail, but then was taken to the hospital, because he complained of a headache and a leg injury. After a doctor had seen him and prescribed aspirin, the appellant was taken to the courthouse for interrogation. He confessed to the crimes during the interrogation.

The Riddles' telephone bill for the month of May, 1982 was introduced into evidence to demonstrate that at 11:13 a.m. on May 4, a telephone call was placed to a Las Vegas, Nevada telephone number. It was established that the number belonged to the appellant's fiancee.

A note which was found tacked to the door of the Riddle residence by Charma's father on May 6 was introduced into evidence. The note contained several misspellings, and stated that the Riddles had made an emergency trip to Tennessee. Charma testified that although she and Hugh had planned a trip to Tennessee at some point in the coming year, they were not about to make such a trip, and neither of them had written the note. The appellant was requested to write the same words that the note contained at trial. He misspelled several words, including the identical misspelling of the word "such," which was spelled "sutch" in both notes.

The appellant testified that he spoke with Hugh Riddle in the late afternoon of May 4, concerning his alleged injury. Hugh ordered him off his property, and as he turned to leave, he was struck on the head. He stated that he remembered nothing until May 6, when he called his sister.

Upon cross examination, the prosecutor read several excerpts of the appellant's confession for the purpose of impeaching his testimony concerning the two day "blackout." The appellant stated he did not remember making any of the statements.

The appellant presented lay testimony that, due to a childhood injury, he had a "soft spot" on his head, which, when touched, caused him to "black out." Also, several relatives, employees, supervisors and co-workers testified that he was a good worker, and that he was not a violent person.

█ The appellant first complains that the confession he made on May 7 was involuntary, and therefore inadmissible for any purpose, because he was not aware he was talking to law enforcement authorities. He contends that he consented to interrogation by the District Attorney because he was convinced by his sister that the District Attorney was an attorney who wanted to help him.[1]

---

1. The appellant's contact with the Muskogee County District Attorney (hereinafter called the D.A.) was engineered by his sister, Dovie Field. Shortly after the murder/shootings, a close friend of the Riddles contacted Dovie and threatened to kill her and her brother. She contacted the police who, after some investigation, told her to file a complaint at the court-

From a review of the testimony had at trial and on the motion to suppress the confession, we are convinced that the circumstances surrounding the appellant's interrogation indicate that he was coherent, and doubtless knew that he was dealing with law enforcement officials.[2]

The portions of the confession were therefore properly utilized for purposes of impeachment. No objection was made to the trial court's instructions concerning the substantive use of the confession, or to the prosecutor's remarks concerning such use. Thus, any error was waived. *Jetton v. State*, 632 P.2d 432 (Okl. Cr.1981). Moreover, in view of both the direct and circumstantial evidence of the appellant's guilt independent of the portions of the confession used at trial, we are convinced that any possible error which may have occurred was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Coleman v. State*, 668 P.2d 1126 (Okl.Cr.1983).

The appellant's third assignment of error is that the failure to file a bill of particulars by the time of the preliminary hearing, or to present evidence in support thereof at the preliminary hearing, deprived the trial court of jurisdiction to sentence him to death. We have previously held that defendants in capital cases are not entitled to preliminary hearings on bills of particular. *Stafford v. State*, 669 P.2d 285 (Okl.Cr.1983), vacated and remanded on other grounds, — U.S. —, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984); *Coleman*, supra; *Johnson v. State*, 665 P.2d 815 (Okl. Cr.1983); *Brewer v. State*, 650 P.2d 54 (Okl.Cr.1982). The bill of particulars, filed on October 4, 1982, complied with the requirements of 21 O.S.1981, § 701.10.[3] The allegations contained therein consisted of the facts of the case, and inferences permissibly drawn therefrom. Further, we do not believe there was any surprise or prejudice to the appellant, since trial counsel neither raised an objection concerning the matter prior to trial or in the motion for new trial. The allegation is without merit.

The appellant's second assignment of error is that the trial court erroneously failed to instruct the jury that the trial court would impose a life sentence if a

---

house. At the courthouse, the D.A.'s secretary learned who Dovie was, and directed her to the D.A.'s office. Dovie and the D.A. discussed the appellant, and she agreed to contact the D.A. when she saw him. According to Dovie, at that time she knew the D.A. was a District Attorney, but thought that meant he was a "higher up attorney"; and that he wanted to help the appellant.

Approximately one hour after Dovie picked the appellant up on May 6, she persuaded the appellant to meet with the D.A. She then called the D.A., told him the appellant was at her home, and admonished him to bring no police or guns. When the D.A. arrived, Dovie's husband, Steve, asked the D.A. if he were the prosecuting attorney. The D.A. replied that he was a prosecutor, but that he did not know whether he would be prosecuting the appellant's case. Dovie, the appellant and the D.A. then drove to the police station in the D.A.'s car. Steve followed along behind in his.

The appellant was taken from the police station to the hospital by the D.A., an investigator for the D.A. and a uniformed policeman. A doctor examined the appellant, suggested he take some aspirin and released him. Hospital personnel testified at trial that the appellant was

coherent. When asked, the appellant agreed to talk, and chose to go to the courthouse rather than back to jail. On the way, the appellant observed and commented upon an accident they passed. Inside the courthouse, the appellant was informed that his interrogator was an investigator for the D.A., and he acknowledged the presence of the uniformed police officer. He was read his rights. He signed a written waiver, and acknowledged the police officer's signature as a witness.

**2.** See footnote 1, infra.

It is also interesting to note that the appellant testified that he was abused as he climbed the stairs to the courthouse, that he was shouted at prior to the tape recorded interrogation and that he was told the uniformed police officer saw only what he was told to see. Without deciding whether the allegations are true, we would only comment that these circumstances support the conclusion that the appellant knew he was not in the hands of a defense attorney.

**3.** Title 21 O.S.1981, § 701.10 states, in pertinent part that, "Only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible."

unanimous verdict were not reached on the issue of punishment.

The instructions given by the trial court accurately and adequately addressed the matter. The instructions stated, in pertinent part:

Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you would be authorized to consider imposing a sentence of death.

If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death. In that event, the sentence must be imprisonment for life. (Instr. No. 15, Tr. 620).

\* \* \* \* \* \*

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed. (Instr. No. 17(a), Tr. 621).

This assignment of error has no merit.

The appellant's ninth allegation of error proceeds upon the following two premises: first, in the guilt stage, the trial court ruled certain testimony by the appellant's mother and sister inadmissible;[4] and second, all the testimony presented by the appellant in the guilt stage was incorporated by stipulation as mitigating evidence in the punishment stage. Citing *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), appellate counsel therefore concludes that, by virtue of the trial court's rulings in the guilt stage, the appellant's right to present evidence in mitigation of the death penalty was unconstitutionally curtailed.

The trial court's rulings in the guilt stage were correct. See, 12 O.S.1981, § 2403, footnote 4 supra. Additionally, there is no argument in either the record or upon this appeal to indicate that counsel was, or even considered himself to be, prohibited from presenting that evidence in the second stage, had he thought it necessary or useful. The argument that alleged error was "bootstrapped" into the punishment stage by a voluntary stipulation is utterly devoid of merit.

We now turn to our statutorily mandated review of whether the sentence of death was appropriate in this case. See, 21 O.S. 1981, § 701.13(C)(1–3).

We first find from a review of the transcript that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor. The appellant was granted a change of venue to ensure his trial was removed from the arena of public prejudice in Muskogee County. The trial court, prosecutor and defense counsel all performed their duties admirably, and the appellant received a fair trial.

Secondly, we must determine whether the evidence supported the jury's determination that the murder of Hugh Riddle was especially heinous, atrocious or cruel, and that the appellant knowingly created a risk of death to more than one person. The appellant has also raised these considerations in his fourth and sixth allegations of error, respectively.

In assessing whether the murder was especially heinous, atrocious or cruel, the appellant would have us consider the shooting as an isolated event, to-wit: that the appellant walked into a room and shot Hugh Riddle at close range with a shotgun, killing him almost immediately. He would therefore have us conclude under *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) and *Odum v. State*, 651

---

**4.** The trial court refused to allow the appellant's mother to testify to the appellant's character and disposition as compared to his siblings'. The mother was allowed to testify, as were several other witnesses, that the appellant had a nonviolent disposition.

The trial court also refused to allow the appellant's sister to give testimony in rebuttal, which defense counsel admitted would be nothing different or new from her testimony given during the case in chief.

P.2d 703 (Okl.Cr.1982) that the murder was not torturous, and therefore was not especially heinous, atrocious or cruel.

According to the plurality in *Godfrey v. Georgia*, the Georgia Supreme Court had defined the aggravating circumstance that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" essentially to mean that torture must have been involved in the murder. *Godfrey*, 446 U.S. at 431, 100 S.Ct. at 1766. This Court has not defined the "especially heinous atrocious or cruel" aggravating circumstance in such a manner. The statute is written in disjunctive language, and we have defined "heinous" as "extremely wicked or shockingly evil"; "pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others." *Eddings v. State*, 616 P.2d 1159 (Okl.Cr. 1980), remanded for resentencing 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

■ While it is true that torture may be a sufficient factor to justify a finding that the murder was especially heinous, atrocious or cruel, (see, *Stafford v. State*, 665 P.2d 1205 (Okl.Cr.1983), wherein the defendant marched six persons into a meat locker and opened fire, amidst the screams for help; and *Jones v. State*, 648 P.2d 1251 (Okl.Cr.1982), wherein the defendant shot his victim at point blank range, and mocked him as he bled to death), it is not a necessary one. In *Eddings v. State*, 616 P.2d 1159 (Okl.Cr.1980), this Court held that the fact that the victim was a police officer rendered the crime especially heinous, atrocious or cruel under the above definitions.

This Court held in *Boutwell v. State*, 659 P.2d 322 (Okl.Cr.1983), that the murder of a convenience store clerk was "especially heinous, atrocious or cruel," because the defendant, who knew the victim, planned the murder well in advance. In *Davis v. State*, 665 P.2d 1186 (Okl.Cr.1983), this Court held that the defendant's act of shooting his victims several times was "atrocious." In *Jones*, supra, we held that the defendant's acts of shooting three per-

sons in a barroom for no apparent reason was "extremely wicked" and "shockingly evil." In *Chaney v. State*, 612 P.2d 269 (Okl.Cr.1980), we held that the manner in which the victims were killed, coupled with the demands for ransom and the manner in which the bodies were disposed of justified the imposition of the death sentence, when one of the aggravating circumstances found was that the murder was especially heinous, atrocious or cruel.

■ Therefore, we decline to consider this murder as though it occurred in a vacuum. We deem it proper to gauge whether the murder was heinous, atrocious or cruel in light of the circumstances attendant to the murder, including the evidence that the appellant had previously expressed his intentions to "get even" with the Riddles; that he probably had been inside the Riddles' home as early as 11:13 a.m. on the day of the murder; that he either lay in wait for them, or returned under the cover of darkness, and broke into their home to stalk them; that he attacked Charma immediately upon being discovered; that having gunned her down, he went into the living room and slayed Hugh; that Hugh doubtless heard the shotgun blasts which tore through Charma's body; that he quite possibly experienced a moment of terror as he was confronted by the appellant and realized his impending doom; that the appellant again attempted to kill Charma in a brutal fashion upon discovery that his first attempt was unsuccessful; that he attempted to conceal his deeds by disconnecting the telephone and posting a note on the door; and that his apparent attempt to steal goods belonging to the Riddles by loading them in their vehicle was prevented only by the arrival of the police officers, adequately supported the jury's finding. See as well our discussion in *Nuckols v. State*, 690 P.2d 463, 55 O.B.A.J. 2259 (Okl. Cr.1984), of the consideration to be given to the manner of a killing in determining whether a murder is heinous, atrocious or cruel.

■ Likewise, it is apparent from these facts that the appellant's murderous

escapade created a great risk of death to more than one person. Evidence at trial, which was subsequently incorporated by reference into the punishment stage, established that when Charma arrived at the hospital, her blood pressure was almost nonexistent, and that she would have died had she arrived any later. The fact that the two victims were not together in the same room when the appellant shot them is immaterial, in light of the close proximity of the victims, and rapid and fluid nature of the appellant's attack.[5]

▉▉▉▉ Thirdly, we hold the sentence of death in this case not to be excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.[6] See *Stout v. State*, 693 P.2d 617 (Okl.Cr.1984), wherein defendant broke into his sister's and brother-in-law's home and beat their brains out; *Nuckols v. State*, supra, wherein defendant stopped to help a motorist, drank a beer with him, visited with him, and then with co-defendant attacked victim with a ball peen hammer, hitting and kicking victim to death; *Stafford v. State*, 669 P.2d 285 (Okl.Cr. 1983) vacated and remanded on other grounds, ─── U.S. ───, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984), wherein the defendant emerged from hiding and shot a family when they stopped along the roadside to help a person they believed to be in distress; *Coleman v. State*, supra, wherein the defendant murdered a man and woman who walked in on him as he was burglarizing their residence; Davis v. State, 665 P.2d 1186 (Okl.Cr.1983), cert. denied, ─── U.S. ───, 104 S.Ct. 203, 78 L.Ed.2d 177, wherein, after a prior altercation, the defendant shot and killed two persons as they were moving his estranged wife's property from his apartment; *Ake v. State*, 663 P.2d 1 (Okl.Cr.1983), wherein the defendant and his accomplice gained entry into their victims' home, tied them up, and shot the four of them, killing two; and *Hays v. State*, 617 P.2d 223 (Okl.Cr.1982), wherein the defendant assaulted some motorists with a pistol after having robbed and killed a store owner. We also find that the appellant's conduct was much more egregious than that of the defendant in *Odum v. State*, 651 P.2d 703 (Okl.Cr.1982), wherein the defendant approached the pickup in which the victim was riding and, from the outside, fired one shot through his neck, and left the scene.[7]

In view of the above, we hold that the appellant's eighth assignment of error, that modification is mandated if one of the two aggravating circumstances falls, must be dismissed.

---

5. The appellant argues in his seventh assignment of error that the trial court's failure to provide any definition for the "knowingly created a great risk of death to more than one person" aggravating circumstance unconstitutionally afforded the jury uncontrolled discretion, within the meaning of *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

This argument has been raised for the first time on appeal. It is therefore not properly before us. *McDuffie v. State*, 651 P.2d 1055 (Okl.Cr.1982). Moreover, as the State asserts, there was no reason to request such an instruction. The constitutionality of the statute has been upheld against arguments that it is overly broad. See, *Burrows v. State*, 640 P.2d 533 (Okl.Cr.1982); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

6. The appellant's fifth assignment of error is that this Court has been evaluating the heinous, atrocious or cruel aggravating circumstances (21 O.S.1981, § 701.12(4)) in an arbitrary manner. We have considered the argument to the extent that it applies to our consideration of whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. 21 O.S.1981, § 701.13(C)(3). Beyond this, the appellant has no standing to complain of decisions reached in other cases.

7. We have also compared this case with the following cases and found the sentence of death herein is not excessive or disproportionate: *Robison v. State*, 677 P.2d 1080 (Okl.Cr.1984), cert. denied, ─── U.S. ───, 104 S.Ct. 3524, 82 L.Ed.2d 831; *Stafford v. State*, 665 P.2d 1205 (Okl.Cr. 1983), vacated and remanded on other grounds, ─── U.S. ───, 104 S.Ct. 2652, 81 L.Ed.2d 359 (1984); *Parks v. State*, 651 P.2d 686 (Okl.Cr. 1982), cert. denied, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983); *Jones v. State*, 648 P.2d 1251 (Okl.Cr.1983) cert. denied, 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002; and, *Chaney v. State*, 612 P.2d 269 (Okl.Cr.1980), cert. denied, 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981).

The judgments and sentences are **AFFIRMED**.

BRETT, J., concurs.

PARKS, J., concurs in results.