802 F.2d 1203
 William Thomas CARTWRIGHT, Petitioner-Appellant,
v.
Gary D. MAYNARD, Warden, Oklahoma State Penitentiary at
McAlester, Oklahoma, and Michael C. Turpen,
Attorney General of Oklahoma,
Respondents-Appellees.
 No. 86-1231.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 29, 1986.
 
 Mandy Welch, of Payne and Welch, Hugo, Okl., for petitioner-appellant.
 David W. Lee (Michael C. Turpen, Atty. Gen., with him on briefs), Asst. Atty. Gen., Oklahoma City, Okl., for respondents-appellees.
 Before BARRETT, McWILLIAMS and TACHA, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Petitioner William Thomas Cartwright, presently incarcerated in the Oklahoma State Penitentiary under sentence of death following his conviction for the offense of Murder in the First Degree, appeals from the federal district court's denial of his petition for Writ of Habeas Corpus. Appellant-petitioner Cartwright was sentenced to death by lethal drug injection on October 25, 1982, for the offense of Murder in the First Degree of the person of Hugh Riddle. On November 12, 1982, Cartwright was sentenced to seventy-five years imprisonment for the offense of Shooting With Intent to Kill the person of Charma Riddle. Cartwright was convicted of said offenses following trial by jury in the District Court of Muskogee County, Oklahoma. The convictions and sentences were affirmed on appeal, Cartwright v. State, 695 P.2d 548 (Okl.Cr.1985), and the Supreme Court of the United States denied the petition for writ of certiorari. Cartwright v. Oklahoma, --- U.S. ----, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985).
 
 
 2
 On August 22, 1985, Cartwright's application for Post-Conviction relief was denied by the District Court of Muskogee County. That denial was affirmed on appeal. Cartwright v. State, 708 P.2d 592 (Okl.Cr.1985). A petition for writ of certiorari was denied by the Supreme Court of the United States. --- U.S. ----, 106 S.Ct. 837, 88 L.Ed.2d 808 (1986).
 
 
 3
 On February 6, 1986, Cartwright filed a Petition for a Writ of Habeas Corpus in the United States District Court for the Eastern District of Oklahoma. On February 11, 1986, that court, following denial of an evidentiary hearing, entered an order denying the petition. This appeal is taken from that order. We affirm the district court's denial of habeas corpus relief.
 
 Factual Background
 
 4
 Cartwright was employed by Hugh Riddle and his wife, Charma Riddle, in their construction-remodeling business in Muskogee, Oklahoma, for about six months from July, 1981, until early January, 1982. The relationship was excellent and Cartwright was promoted to foreman of a crew of about five. The Riddles considered Cartwright a conscientious employee and friend. Cartwright visited at the Riddle home often on business and social occasions.
 
 
 5
 In December, 1981, while working for the Riddles, Cartwright fell through loose flooring and injured his leg. He was treated at a hospital emergency room. On January 2, 1982, Cartwright contacted the Riddles about payment of the small medical bill[1] and Hugh Riddle laid him off.
 
 
 6
 In January, 1982, Cartwright moved to Las Vegas, Nevada. Cartwright returned to Muskogee, Oklahoma, on May 1, 1982, after he claimed to have received a phone call from an unidentified attorney advising him that Hugh Riddle had determined to settle on the medical bill. During the evening of May 4, 1982, Hugh Riddle was killed by a shotgun blast at his home. Charma Riddle was also shot twice, her throat was cut and she was stabbed in the abdomen, but was able to notify the police before her attacker, whom she identified at trial as Cartwright, cut the telephone line. Upon arriving at the Riddle residence, the police noticed a lone male running away from the area.
 
 
 7
 Late at night on May 6, 1982, Cartwright phoned his sister at her home in Muskogee from a pay telephone. His sister, Dovie Marie Field, informed him that the police were looking for him. After driving him to her home, feeding him and giving him aspirin for a bad headache, she phoned Assistant District Attorney Edmondson with whom she had spoken earlier in the day regarding Cartwright's whereabouts. Edmondson came to her home and took her and her brother to the police station just before midnight on the evening of May 6, 1986. (R., Vol. I, pp. 218-220).
 
 
 8
 At the police station, Cartwright complained of a headache and a pain in his left knee. He was taken to a hospital emergency room where he was examined by Doctor Charles Thomas Morgan. Cartwright said he had headaches "off and on" since childhood because of a "soft spot" on his head. Dr. Morgan diagnosed Cartwright as having a "nonspecific headache" and recommended aspirin. Id. at 561. Dr. Morgan did not administer any drug and he did not prescribe any. Cartwright was then asked whether he wished to go to the police station and get some rest or go to the courthouse for interrogation. He said he did not care. Id. at 502.
 
 
 9
 Cartwright was taken to the courthouse and was interrogated by Investigator Gary Sturm in the presence of Officer James Allen Stone. Prior to interrogation, Cartwright was orally informed of his "Miranda" rights by Sturm and thereafter he read and acknowledged those rights. Cartwright signed a written waiver. The tape recorded interrogation started at about 2:15 a.m. and lasted about an hour. While Cartwright did complain of a headache, his responses to questions posed by Sturm were clear and direct.
 
 
 10
 For a substantial initial portion of the questioning by Sturm, resulting in some 28 typed pages from the tape recording, id. at 553, Cartwright related that he had gone to the Riddle home on the evening of May 4, 1982, to speak with Hugh Riddle about the medical expenses he (Cartwright) had incurred and while standing on the front porch of the Riddle home speaking with Hugh Riddle, he was hit on the head and blacked out. He had no recollection of anything more until he woke up in a ditch on the morning of May 6, 1982. Cartwright was fully aware of the charges against him but insisted that he had not entered the Riddle home and had not had any further contact with Hugh or Charma Riddle. Suddenly, during the interrogation, Cartwright recalled: going "back" to the Riddle home on the evening of May 4, 1982; watching the Riddles eat; entering the Riddle home through a side door; obtaining a loaded gun in the bedroom closet; the gun going off when Charma Riddle "grabbed" it, and the gun going off again; shooting Hugh Riddle and then finding Charma Riddle sitting on the bedroom floor as he cut the phone wire; his cutting and stabbing Charma Riddle with a pocket knife; and his placement of the two guns, sleeping bags and other things in the Riddle Blazer truck. He also recalled seeing a spotlight as he placed a note on the Riddle door and ran away.
 
 
 11
 An Information was executed by the District Attorney for Muskogee County, Oklahoma, charging Cartwright with the subject crimes on May 5, 1982. It was supported by an Affidavit executed by Mr. Edmondson, the Assistant District Attorney, who related that Lt. Tom Spriggs had informed him that Charma Riddle had stated to him that Tom Cartwright had shot her and her husband with a shotgun in their home on the evening of May 4, 1982. The district court judge found probable cause and a Warrant for Cartwright's arrest on the subject charges was issued May 5, 1985. The warrant was served on Cartwright May 7, 1985. On that same date, Cartwright executed a pauper's affidavit and attorney John Garrett was appointed to represent him. Cartwright was ordered to be held without bond. A preliminary hearing was held on June 14, 1982. Cartwright was bound over for district court arraignment and bond was again denied. On July 1, 1982, Cartwright was arraigned. He entered a not guilty plea after waiving reading of the Information. The court granted Cartwright thirty days within which to file motions. After various motions were filed and ruled on, the case came on for trial commencing October 18, 1982. The jury verdict was returned on October 20, 1982, and sentence was handed down on October 25, 1982.
 
 
 12
 On October 25, 1982, Cartwright made out a handwritten statement. He related that he had never seen a doctor for his head pain but each year the pain grows stronger and harder to control. Contrary to his admissions on May 7, 1982, he wrote that he recalled: going to the Riddle home on the evening of May 4, 1982; the conversation with Hugh Riddle about the medical bills; someone struck him on the head and he fell to the ground; he heard screams and shots as someone placed something in his arm; he tried to move but could not because he was numb all over; one of "them" took off his shirt and put it on him so that Charma Riddle would identify him; "they" blindfolded him, tied his hands and feet, placed him in a van; and he did not recall anything until he woke up while laying in a ditch in the rain on the morning of May 6, 1982.
 
 Evidence at Trial
 
 13
 Cartwright testified at trial in his own defense. He stated that he received a phone call while in Las Vegas from an unidentified attorney advising him that Hugh Riddle wished to settle with him (Cartwright) on the small medical bills involving the injury to his leg during the fall the day he was fired; soon afterwards, he obtained a plane ticket to fly to Tulsa; from Tulsa he travelled to Muskogee, his hometown, where his parents and other relatives reside, arriving on May 1, 1982. He stated that he contacted Hugh Riddle at Riddle's home phone on the morning of May 4, 1982, at which time it was agreed that he (Cartwright) should come to the Riddle home about 5:30 or 6:00 p.m. that day. There is substantial evidence that Hugh Riddle was not at his home on May 4, 1982, until the evening hours of 5:00 p.m. or thereabouts. Hugh and Charma Riddle had spent the night of May 3, 1982, at Charma's father's home in Muskogee. Neither returned to their home until the evening hours of May 4, 1982. A telephone bill was introduced in evidence demonstrating that on May 4, 1982, at 11:13 a.m. a long distance call was placed from the Riddles' phone to the Las Vegas, Nevada, phone of Cartwright's fiancee.
 
 
 14
 Cartwright further testified that: when he was a boy he was pushed out of a door of a moving car and hurt his head and that any time he gets any pressure applied to his head, he blacks out; he has blacked out sometimes for two or three days, depending on the amount of pressure applied to his head and this has happened several times; he did not place a long distance call to his fiancee from the Riddle telephone on May 4, 1982; he went to the Riddle home about 5:00 p.m. on May 4, 1982; Hugh Riddle was cutting the lawn when he arrived; he informed Hugh Riddle about receiving the call from an unidentified attorney who advised him that Hugh Riddle wished to settle the medical bills he had incurred involving the fall and injury; Hugh Riddle ordered him off of his property and as he turned to leave he was struck over the head; he has no recollection of anything until the morning of May 6, 1982, when he woke up near a creek in a wooded area near Muskogee.
 
 
 15
 Cartwright also testified that: he had never consulted a doctor about the "blackouts" because he does not like doctors, hospitals and clinics; that he recalled going to District Attorney Edmondson's office and being interviewed on May 7, 1982, by Mr. Sturm in the presence of three men, but he could not remember making any statements; when he was taken to the courthouse and interviewed by Mr. Sturm, his head was hurting but nobody would pay any attention to his condition. When Cartwright was recalled to the stand he further testified that: he did not know that the statements he made could be used against him; he had been told that District Attorney Edmondson was going to help him; someone told him that if he did not make certain statements to the police when he was picked up that some member of his family would possibly be killed. Id. at 571-73.
 
 
 16
 Charma Leigh Riddle, residing at Dallas, Texas, at the time of trial, testified that: She and her husband, Hugh, had spent the evening of May 3, 1982, at her father's home and did not return to their home until early evening on May 4th; they ate their evening meal and retired to the living room to watch television; she left to go to the bathroom; she was confronted by a man holding a shotgun with the barrel pointed at her in a narrow hallway; she grabbed the gun barrel and the man fired it, the shot striking her leg; as she fell to the floor she recognized the man as Cartwright; Cartwright shot her again, this time in the other leg; she observed Cartwright walk into the living room where Hugh was; she saw Cartwright fire twice and she heard her husband scream; she dragged or scooted herself down the hallway into a bedroom where she tried to make a call on the telephone but it was dead; she then proceeded to write her assailant's name on the white bed sheet in her blood; she managed to spell out the letters TOM CAR when she ran out of blood; Cartwright then entered the bedroom; Charma asked Cartwright why he did it and he said "we shouldn't have fired him," id. at 394; Charma responded that they did not fire him, rather he was laid off; Charma asked Cartwright to help her and he came to the bed and acted as though he was going to pull her up on the bed; he placed his left hand on her forehead, cut her throat and stabbed her in the abdomen with a hunting knife she and Hugh had given him as a Christmas gift; after Cartwright left the room, she then managed to crawl under the bed and plug in the telephone; she was put in contact by the operator with a Muskogee police dispatcher; Charma, in a critical state, informed them that she and her husband had been shot by Cartwright in their home and that Cartwright was still in the house; Cartwright came back into the bedroom and cut the telephone line.
 
 
 17
 Muskogee law enforcement officers testified that they arrived at the Riddle residence after notification from the police dispatcher. A man was observed standing near the Riddle home by one of the officers and then seen ducking between trees and running away. Clothing, two guns and other personal possessions of the Riddles were found in the Riddle vehicle, including a silver jacket which Cartwright identified as identical to that which he owned and had lost.
 
 
 18
 A note was found attached to the front door of the Riddle home by Charma Riddle's father on May 6, 1982. It was introduced in evidence. In printed form it read: "SORRY SUTCH SHORT NOTESS WE WHEN'T TO TENNASIE ON EMERGENCIE BE BACK NEXT WEEK. FEED IS IN BARN." It was signed "Hugh M. Riddle." During cross-examination the State handed Cartwright a piece of paper and pencil and asked him to print the identical words appearing on the note found on the Riddle front door. Id. at 501. This sheet was admitted in evidence as State's Exhibit 26 and in printed form reads: "SORRY SUTCH SHORT NOTIC WE WENT TO TENNISE ON EMERGENCE BE BACK NEXT WEEK FEED IS IN BARN." Charma Riddle testified that although she and Hugh had planned a trip to Tennessee the next year, they had no immediate plans to take such a trip and that neither of them had written the note found on their front door.
 
 
 19
 Cartwright's mother, Betty Cartwright, testified that when Cartwright was three years of age he "had a severe head injury" which caused "several severe headaches on through his life." Id. at 431. She stated that as a result of the head injury, he has suffered migraine headaches which at times were so severe that "he didn't know what he was doing, you know." Id. at 432. The only other witness who testified about Cartwright's headaches was his sister, Dovie Field. She stated that when Tom was three years old he was pushed out of a moving car and fell on his head and has had a soft spot on his head since; that when she cut his hair he would pass out from pressure she put on the soft spot on his head; that she has seen Cartwright pass out several times. Id. at 434-36.
 
 
 20
 Eulan Pack, Jr., a friend of both Cartwright and the Riddles, testified that before Cartwright left for Las Vegas he remarked that the Riddles would not pay the medical bills and that if he (Cartwright) did not get the money from Hugh Riddle to pay the bills, he would "get Hugh Riddle." (R., Vol. I., pp. 101, 102). Similarly, Cartwright remarked to Clifford D. Hamilton, a fellow employee with the Riddles, that he intended "to get even" with Hugh Riddle. Id. at 125. Cartwright denied that he made such a remark to Hamilton. Hamilton worked with Cartwright for some five months, during which time they worked some days as much as ten to fourteen hours; Cartwright did not display any tendencies to violence and did not use any rough language; he visited socially with Cartwright on many occasions. Id. at 458, 459. Hamilton did not testify about any "blackouts" suffered by Cartwright during the period he knew and worked with him.
 
 Issues on Appeal
 
 21
 The appellant/petitioner presents the following contentions on appeal: (1) He was denied due process of law when the state trial court denied his motion for a complete psychological evaluation; (2) he was deprived effective assistance of counsel at trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution; (3) the federal district court erred in denying his motion for an evidentiary hearing regarding his petition for writ of habeas corpus; (4) he was deprived of his right to a fair and impartial jury which represented a cross-section of the community in violation of the Sixth and Fourteenth Amendments to the United States Constitution; (5) Oklahoma's interpretation of "especially heinous, atrocious or cruel" is vague and overbroad, resulting in an arbitrary and capricious imposition of the death penalty, in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States; and (6) the state trial court failed to adequately instruct the jury regarding the meaning of "knowingly creating a great risk of death to more than one person," leaving the jury with unbridled discretion regarding its meaning and application.
 
 I.
 
 22
 Cartwright contends that the federal district court erred in finding/concluding that he was not denied due process of law when the state trial court denied his motion for a complete psychological evaluation. Cartwright points out that under Tit. 21, Okl.Stat. Sec. 152(6) (1984) a person cannot be held responsible for criminal conduct if done while unconscious.
 
 
 23
 Prior to trial, Mr. Garrett, trial counsel for Cartwright, filed a motion for a "complete psychological evaluation" going "far beyond the question of right and wrong and ability to assist me as counsel." The motion was made following Cartwright's evaluation at the state hospital based on Mr. Garrett's representation to the court, as follows:
 
 
 24
 And after having many occasions to visit with Mr. Cartwright and not only Mr. Cartwright himself but members of the family, and I can state that it is my opinion after having talked with William Cartwright, William Cartwright's mother and father and two sisters that he in fact is in dire need, or we are in dire need of, some assistance as far as a complete psychological evaluation from either a doctor within the state institution or from a private source somewhere within the State of Oklahoma.
 
 
 25
 (R., Vol. XIV, p. 3.)
 
 
 26
 Following Cartwright's trial and conviction, and denial of post-conviction relief and certiorari, Cartwright filed the habeas corpus petition herein. Attached to his motion for an evidentiary hearing on his habeas petition was the Affidavit of Attorney Mandy Welch and a letter dated February 2, 1986, marked Exhibit B, from Kit Farwell, Ph.D. In the letter, Dr. Farwell had, following a review of much of the trial testimony and other material, concluded that "there is a very strong possibility that Cartwright did suffer from a psychological and/or neurological disorder at the time of the crime and the period thereafter," which, according to Dr. Farwell, created a suspicion that Cartwright "suffered a loss of ability to control his behavior and displayed problems with his memory of events surrounding this period due to serious psychopathology and/or neurological damage." Dr. Farwell concluded that further psychological testing and referral to a psychiatrist for additional neurological study was required to determine Cartwright's mental state at the time the offenses were committed. Dr. Farwell did not address the record with any specifics.
 
 
 27
 The federal district court in the case at bar, after applying the facts to the standards (factors) discussed by the Supreme Court in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), (Ake) denied Cartwright's habeas corpus petition. In so doing, the court agreed with the Oklahoma Court of Criminal Appeals that the record does not establish that Cartwright's sanity was a viable issue upon which Cartwright could have based his defense. The federal district court favorably quoted from Cartwright v. State, 708 P.2d 592, 595-596 (Okl.Cr.1985), cert. denied, --- U.S. ----, 106 S.Ct. 837 (1986):
 
 
 28
 In contrast, (with the factors analyzed by the Supreme Court in Ake ) the petitioner did not use the insanity defense, he did not display any bizarre behavior, an examination by the state psychiatrist showed that he was competent to stand trial and was able to assist in his defense, and finally stated that further observation was unnecessary. Although the petitioner complained of recurring blackouts, a physician who examined him three days after the crimes could not find anything abnormal even though his attention was specifically called to the "soft spot" on the petitioner's head alleged to be the reason the blackouts occurred. In his statement to the police, the petitioner first claimed to have experienced a blackout and was therefore unable to recall his last two days, but after further questioning he gave in detail the events during the crimes. These events were corroborated by the witness, Mrs. Riddle. In his testimony during the trial he first claimed that he had been hit on the head, and that he had no recollection of what happened for the next two days. On cross-examination he claimed he could not remember the statement which he made to the police which contradicted his testimony. On sur-rebuttal he changed his story, claimed that he gave the police a statement which he was instructed to give by his unknown assailant about whom he had earlier testified.
 
 
 29
 In the federal district court, as here, petitioner relies almost exclusively on Ake v. Oklahoma, supra, for the proposition that he was denied due process of law and effective assistance of counsel when his motion for a complete psychological evaluation was denied. We agree that Ake, supra, is the focal case for our consideration. Ake holds that when an indigent defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the State must provide access to a psychiatrist's assistance on the issue.
 
 
 30
 Ake was a first degree murder prosecution. There Ake acted in such a bizarre manner during his arraignment, that the trial court, sua sponte, ordered him committed to the state psychiatric hospital to determine his present sanity or competency to stand trial. The chief forensic psychiatrist at the state hospital notified the trial court that Ake was not competent to stand trial. The trial court held a competency hearing. A state psychiatrist testified that Ake was a paranoid schizophrenic, dangerous, with poor control and suffering from delusions. The trial court found Ake a mentally ill person and in need of care and treatment. The court also found Ake incompetent to stand trial and committed him to the state mental hospital.
 
 
 31
 After months of treatment and medication, Ake was returned for trial. Prior to trial, Ake's counsel moved for a psychiatric examination by the state or that funds be provided to allow him to obtain the services of a psychiatrist. Ake's counsel made it clear that Ake's defense would be that of insanity at the time that the charged killings occurred. The trial court denied the motion. At the guilt phase of Ake's trial, Ake's sole defense was insanity at the time of the offense. The psychiatrists who had examined Ake at the state hospital testified extensively but none testified about Ake's sanity at the time of the offense because none had examined him relative thereto.
 
 
 32
 The jurors were instructed that Ake could be found not guilty by reason of insanity if he could not distinguish right from wrong at the time of the offense. Furthermore, the jury was instructed that Ake was presumed to be sane at the time of the offense unless he presented evidence sufficient to create a reasonable doubt on the issue. There was no expert testimony on the defense interposed by Ake, i.e., his alleged insanity at the time of the offense.
 
 
 33
 As set forth supra, the Court in Ake held that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist if the defendant cannot otherwise afford one. The Court also held:
 
 
 34
 The foregoing leads inexorably to the conclusion that, without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high. With such assistance, the defendant is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination.
 
 
 35
 * * *
 
 
 36
 * * *
 
 
 37
 When the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent.
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.
 
 
 41
 Ake, supra, 105 S.Ct. at 1096.
 
 
 42
 We hold that the district court properly denied Cartwright's habeas petition because it was based on general allegations of need without substantive, supporting facts. Unlike Ake, Cartwright failed to make a preliminary showing that his sanity or mental capacity at the time of the offense was likely to be a significant factor at trial.
 
 
 43
 In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2637, n. 1, 86 L.Ed.2d 231 (1985), the Supreme Court, citing to Ake, upheld the trial court's denial of a motion to appoint experts and investigators to assist the defense. The Court observed that the request was not based on facts but rather a general statement of need, involving "little more than an undeveloped assertions that the requested assistance would be beneficial."
 
 
 44
 In United States v. Sloan, 776 F.2d 926 (10th Cir.1985), we examined Ake. We there held that if "sanity" or "mental capacity" defenses were to be defense issues, they must be established by a "clear showing" by the indigent defendant as "genuine," "real" issues in the case. In order for a defendant's mental state to become a substantial threshold issue, the showing must be clear and genuine, one that constitutes a "close" question which may well be decided one way or the other. It must be one that is fairly debatable or in doubt. Our interpretation of the showing required under Ake is consistent with the interpretation of Ake's standard for appointment of a medical expert to aid an indigent defendant who has raised the insanity defense set forth in Volson v. Blackburn, 794 F.2d 173, 176 (5th Cir.1986):
 
 
 45
 It is not unreasonable to argue, as Volson does, that a defendant's sanity at the time of the offense will always be a significant factor at trial whenever the defendant pleads insanity. This Court does not read Ake that broadly, however. Rather, Ake requires that the defendant, at a minimum, make allegations supported by a factual showing that the defendant's sanity is in fact at issue in the case. In the instant case, Volson's attorney merely alleged that Volson was unable to understand the difference between right and wrong at the time of the offense. This conclusional allegation is considerably less evidence of insanity than was present in either Ake or Pedrero.[4] (In Pedrero v. Wainwright, 590 F.2d 1383 (5th Cir.), cert. denied, 444 U.S. 943 [100 S.Ct. 299, 62 L.Ed.2d 310] (1979), the court held that a showing that the defendant was a drug addict and that he had been in a mental institution a few years before the offense was insufficient to establish his entitlement to a psychiatric expert at state expense). See also, Bowden v. Kemp, 767 F.2d 761, 765 (11th Cir.1985) (on remand for reconsideration in light of Ake ) (Ake showing not met by undeveloped assertions that psychiatric assistance would be beneficial). (footnote deleted.)
 
 
 46
 Therefore, the issue before us, properly stated, is whether, upon review of the entire record, Cartwright could have made a threshold showing under Ake that "his sanity at the time of the offense is to be a significant factor at trial...." We hold that, based on the record before us, Cartwright could not have made the threshold showing required under Ake.
 
 
 47
 Before this court, counsel for Cartwright has insisted that questions about Cartwright's mental condition "were raised in the State's motion for commitment and Cartwright's motion for a psychological evaluation." (Brief of Petitioner, p. 11.) The so-called "State's" motion for commitment is in fact a Joint Application of Mr. Garrett, trial counsel for Cartwright, and the State based upon "a doubt as to his [Cartwright's] sanity [which] has been raised by defendant's attorney." The trial court, in ordering commitment for "observation and examination" for a period not to exceed sixty days did so based upon the "doubt raised by defendant's attorney as to the present sanity of the defendant." (Emphasis added). Thus, present sanity or sanity to stand trial was the sole basis of Cartwright's request for examination.
 
 
 48
 During the period of Cartwright's stay at the hospital, his actions and conduct were very normal and cooperative; he displayed a calm disposition and was never on any medication. He did not display any erratic or bizarre behavior, as in Ake. The doctors did not diagnose him as having any mental illness. He was not diagnosed as suffering from any psychotic disorder such as schizophrenia or psychomotor epilepsy. A complete physical examination did not disclose any neurological problems. The electroencephalogram test was normal. Cartwright's I.Q. tested at 98, which is considered to be average intelligence.
 
 
 49
 The report submitted May 25, 1982, by the Deputy Superintendent for Clinical Services, Dr. Curva, of Eastern State Hospital, Vinita, Oklahoma, stated: Cartwright was able to comprehend the exact nature of the proceedings pending against him; Cartwright can adequately advise/assist his counsel in the defense of his case; the staff concluded that Cartwright was not in need of psychiatric care and/or treatment and was competent to stand trial; Cartwright is not considered dangerous to himself and/or others. Throughout the various documents involving Cartwright's commitment/evaluation, continual references are made to Cartwright's "blackout" complaints arising from the injury to his head when he was a child. Every examiner, it seems, was made aware of this history. Yet none recognized it as a condition bearing on Cartwright's mental state in relation to his competency to assist in his own defense at trial.
 
 
 50
 Cartwright was also examined by a Dr. Richard L. Pentecost on September 8, 1982. Dr. Pentecost's letter to the trial court of September 28, 1982, makes no reference to complaints made by Cartwright about blackouts or other mental problems. Following Cartwright's arrest, Dr. Morgan examined him. He found, following an examination of Cartwright's head, that there were no abnormalities even though Cartwright had complained of a headache. Cartwright's "blackout" defense is not substantiated by any medical evidence.
 
 
 51
 Additionally, the inconsistencies in Cartwright's own testimony regarding the events of May 4, 1982, through May 6, 1982, undermine his "blackout" defense. Cartwright's statement of May 7, 1982, involves his initial contention that he (Cartwright) suffered a "blackout" at the Riddle residence when he was allegedly struck on the head as he was preparing to leave and that he woke up two days later in a ditch. Then, following additional testimony of non-recall, the transcript of the May 7th statement contains sudden, abrupt admissions of facts by Cartwright regarding the crimes committed at the Riddle home. Significantly, Cartwright further contradicted his testimony about the occurrences after he suffered the "blackout" when struck on the head on May 4, 1982. In his handwritten statement of October 25, 1982, he related that after speaking with Hugh Riddle about the medical bills and after turning to depart, he was hit on the head and as he fell to the ground someone stuck something in his arm as he heard screaming and gun shots. He stated that he tried to move but could not because he was numb all over, that "they" blindfolded him and placed him in a van; one of "them" took off his shirt and put it on him (Cartwright) so that Charma Riddle would identify him (Cartwright). Finally, Cartwright wrote that he woke up in a ditch in the rain. Cartwright contended that the "real killers" had given him instructions as to what to testify to should he get caught.
 
 
 52
 Cartwright's claim that he suffered a "blackout" when hit on the head at the Riddle residence which created a loss of memory of the crimes with which he was charged, Reply Brief, p. 2, is simply not credible. Unlike the medical report submitted in Ake, here there was no medical indication that Cartwright suffered from any mental infirmity. There is nothing in terms of medical evidence that Cartwright's "blackout" history was indicative of a possibility that he was suffering from a psychological and/or neurological disorder at the time of the offense and thereafter. Moreover, his blackout defense fails to rebut his own admissions, amply substantiated and corroborated: He did enter the Riddle home unbeknown to Hugh and Charma Riddle; he took Hugh Riddle's shotgun from a bedroom closet; he stalked Charma Riddle in the hallway where he shot her twice; he then shot and killed Hugh Riddle in the living room; he then spoke with Charma Riddle who was in a critical condition pleading for help while on the floor of a bedroom; he cut the telephone wire and thereafter used his hunting knife to cut her throat and stab her. Charma Riddle's version of the incident was not known to Cartwright during the early morning of May 7, 1982, when he gave his statement to Mr. Sturm. There can be no doubt that the versions are nearly identical in critical parts. This alone defies Cartwright's contention that he had blacked out when struck on the head outside of the Riddle home and had no recollection of anything which may have happened until he woke up in a ditch on the morning of May 6, 1982.
 
 
 53
 We note that following his release from employment with the Riddles, Cartwright had informed Eulan Pack, Jr. that if he did not get the money from Hugh Riddle to pay the medical bills, he would "get Hugh Riddle." Cartwright also stated to Clifford Hamilton that he intended "to get even" with Hugh Riddle. Further, no explanation is given for the phone call placed from the Riddle residence at 11:13 a.m. on May 4, 1982, traced to Cartwright's fiancee's phone in Las Vegas, Nevada. These facts are indicative of premeditation and awareness.
 
 
 54
 We do not consider the issue of Cartwright's mental capacity at the time of commission of the offenses charged in the case at bar to be clear or substantial; it is not a close question, and it is not in doubt. Based upon the facts and circumstances of the record before us, the "blackout" contention is not a genuine issue. See, Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). We agree with the district court that the facts in this case, unlike those in Ake, demonstrate that Cartwright's sanity was not a substantial issue in his trial. Cartwright did not present a substantial threshold showing of insanity or mental incapacity.
 
 
 55
 Insofar as the alleged constitutional error involving the failure to provide Cartwright with a psychiatrist to assist him during the sentencing portion of the trial is concerned, we simply observe that the State did not, contrary to the Ake case, present any psychiatric testimony about Cartwright's future dangerousness. Thus, Cartwright's "future dangerousness" was not a real factor in the sentencing phase of the case. Furthermore, no request was made for the appointment of a psychiatrist for the purpose of presenting mitigating evidence at the sentencing stage. Such a request was made in Ake.
 
 II.
 Denial of Effective Assistance of Counsel
 
 56
 Cartwright argues that the representation by his appointed counsel, Mr. John Garrett, fell below the objective standard of reasonableness, particularly with regard to sentencing, resulting in a trial that cannot be relied upon as having produced a just result. Thus, he contends that he was denied effective assistance of counsel violative of the Sixth and Fourteenth Amendments to the Constitution of the United States set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 
 
 57
 Cartwright contends that his trial counsel failed to explore and investigate undefined "facts and circumstances" about him which were relevant to punishment, regardless of guilt. Cartwright argues that Mr. Garrett's trial performance was deficient on two fronts. It is argued that counsel's opening argument was without even a hint of a possible defense except that Cartwright would "tell his story" and, in closing, reliance was had simply on Cartwright's "version of the story" and that there was no evidence contradicting the testimony about Cartwright's "blackouts" and memory loss. (Brief of Petitioner, p. 35.) Further, with regard to the sentencing stage, it is pointed out that Mr. Garrett waived an opening statement and called no witnesses to testify either in defense of the allegations of aggravating circumstances or in mitigation of punishment. Id. Specifically, Mr. Garrett is criticized, notwithstanding his personal belief that Cartwright suffered from a mental disorder, from making any reference about it in mitigation of punishment: "Although he recognized the bizarre nature of his client's testimony, he did not talk to the jury about it, leaving them with only one possible impression--that there is no explanation which is favorable to Mr. Cartwright." Id. at 37.
 
 
 58
 Strickland v. Washington, supra, established a two-part "performance" and "prejudice" test: Reversal is required only when a criminal defendant demonstrates that his attorney's performance was deficient and the deficiency prejudiced his defense. A deficient performance is established if counsel's representation "fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. at 2065. In making a judgment on counsel's representation, Strickland admonishes the reviewing court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. at 2065. If counsel's performance is determined to have been deficient, a defendant still must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068. See also, Nix v. Whiteside, --- U.S. ----, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).
 
 
 59
 We agree with this finding of the federal district court:
 
 
 60
 "Petitioner's claim of ineffective assistance of counsel is without merit. The record before the Court indicates that petitioner's trial counsel in representing petitioner filed a Motion to Suppress Evidence, Motion for Severance, Motion for Psychological Evaluation and Motion to Change Venue, which resulted in the case being tried in another county, rather than the county where the alleged murder took place. In addition, the trial record reflects that the defense counsel effectively cross-examined prosecution witnesses, demurred to the evidence of the State and called thirteen witnesses on behalf of the petitioner during the course of the trial. This Court finds that the conduct of petitioner's court-appointed counsel can be very favorably compared to the defense attorney in United States v. Fitts, 576 F.2d 837, 839 (10th Cir.1978), where the Court stated:
 
 
 61
 "The record reflects that counsel conducted the defense in an acceptable manner. He challenged testimony of the government witnesses on cross-examination, interposed appropriate objections, called and adequately examined a defense witness to refute the incriminating testimony of Jost and presented arguments which demonstrated his knowledge of the law and facts in this case."
 
 
 62
 This case presented very difficult tactical choices for trial counsel. Without elaborating, we observe that defense counsel would have been confronted with a credibility hurdle of great proportion had he elected to argue exclusively and vehemently in both opening and closing that Cartwright suffered a "blackout" when struck on the head and had no recollection of anything from that time early in the evening of May 4, 1982, until he awoke in a ditch on the morning of May 6, 1982. This contention was refuted by Charma Riddle's testimony and by Cartwright's admissions. Certainly counsel did rely on the "blackout" defense but he did not do so in a manner as to present a direct credibility confrontation with the testimony of Charma Riddle and the law enforcement officer who interrogated Cartwright following his arrest. We are impressed by the manner defense counsel walked a veritable tightrope. Counsel effectively pursued efforts to obtain complete psychological evaluation for Cartwright and he conducted effective cross-examination. He posed vigorous objections. His trial representation was adequate.
 
 
 63
 The significant challenge to trial counsel's alleged ineffective performance is directed to the sentencing stage of the trial proceeding. On appeal, Cartwright contends that "At the sentencing stage, Mr. Cartwright was virtually without representation. Mr. Garrett waived opening statement and called no witnesses to testify either in defense of the allegations of aggravating circumstances or in mitigation of punishment." (Brief of Petitioner, p. 35.) Although no witnesses were called, Mr. Garrett had obtained a stipulation which allowed in evidence the prior testimony of Cartwright's mother, sister, uncle, co-workers and friends bearing on his good demeanor, character, lawful conduct and good work record. These matters were fully before the jury.
 
 
 64
 We have already observed that Mr. Garrett was faced with a dilemma involving equally unsatisfactory tactics. Our review of the record indicates that his trial tactic was that of hoping that the jury adopted enough of the defenses in whole or in part to establish a reasonable doubt of Cartwright's guilt. These defenses included a complete disavowal of any knowledge of the crimes in light of the "blackout" which lasted from the time Cartwright was struck on the head until he woke up in a ditch two days later. The difficulty with this defense was obvious at trial because (a) Charma Riddle testified that she conversed with Cartwright when he entered the bedroom after shooting her; they talked about why Cartwright shot her and her husband; and Cartwright responded that he did so because he had been fired, and (b) the note left on the Riddle door corresponded with the misspelled note printed by Cartwright during the trial, particularly the word "SUTCH;" and (c) Cartwright's tape-recorded admissions-confessions wherein he recounted in detail the facts of the crimes committed at the Riddle home on the evening of May 4, 1982. Another defense was that someone struck Cartwright on the head; as he was being tied up, he heard screams and shots; someone put a shirt on him which Charma Riddle would identify as the shirt worn by the person who shot her; he was placed in a van and driven away; and he woke up in a ditch on the morning of May 6, 1982. The last defense, from Cartwright's pen, was that an unidentified person notified him that if he did not take the blame, members of his family would be harmed. In addition to the problems involving this varied scenario, Mr. Garrett could not counter the fact that a long-distance telephone call had been placed from the Riddle residence phone at approximately 11:13 a.m. on the morning of May 4, 1982, to Cartwright's fiancee in Las Vegas, Nevada.
 
 
 65
 Trial counsel's actions were well within the range of professionally reasonable judgments. We do not perceive that there existed any "reasonable probability" that the result would have been different given other trial tactics. See Denton v. Ricketts, 791 F.2d 824 (10th Cir.1986); United States v. Payne, 641 F.2d 866 (10th Cir.1981); United States v. Miller, 643 F.2d 713 (10th Cir.1981).
 
 III.
 
 66
 Cartwright contends that the federal district court erred in denying his motion for an evidentiary hearing on his petition for habeas corpus regarding his need for the assistance of a mental health expert to assist in the preparation and presentation of his defense at trial and on his claim of ineffective assistance of counsel. Cartwright contends that these claims rely upon facts outside of the trial record which cannot be resolved without a full evidentiary hearing, and that he is entitled to present evidence in support of these allegations. He relies on 28 U.S.C. Sec. 2254(d), Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and Martinez v. Romero, 661 F.2d 143 (10th Cir.1981).
 
 
 67
 The federal district court reviewed the situations identified in Townsend v. Sain, supra, which would dictate an evidentiary hearing in federal court for a habeas corpus petitioner: (1) if the merits of a factual dispute were not resolved in a state hearing, (2) if the state factual determination is not fairly supported by the record as a whole, (3) if the finding procedure of the state trial court was not adequate so as to afford a full and fair hearing, (4) if there exists a substantial allegation of newly discovered evidence, (5) if material facts were not adequately developed at state court hearings, or (6) if for any reason it appears that the state trier of fact did not afford the applicant a full and fair fact hearing.
 
 
 68
 The federal district court found, and we agree:
 
 
 69
 The records and transcripts before this court conclusively establish that the state fact finding procedures were more than adequate to afford a full and fair hearing, that the state trier of fact did afford applicant a full and fair fact hearing, and that all necessary material facts were adequately developed at the state court hearings. Moreover, the record and transcripts establish beyond doubt that the merits of all factual disputes were resolved in the state hearings, and that the state factual determinations are sufficiently supported by the record as a whole.
 
 
 70
 Accordingly, the Court finds that the record and transcripts of the state court proceedings provide all the necessary data for a satisfactory determination of the issues raised in the petition, and an evidentiary hearing is not required. Townsend v. Sain, supra, at 318; Sumner v. Mata, 449 U.S. 530 [ (539) 101 S.Ct. 764, 66 L.Ed.2d 722] (1981) (SumnerI), Sumner v. Mata, 455 U.S. 591 [102 S.Ct. 1303, 71 L.Ed.2d 480] (1982) (Sumner II).
 
 
 71
 Cartwright contends that his specific allegations regarding his need for a complete psychological evaluation to assist in his defense and ineffective assistance of counsel are claims which have never been the subject of an evidentiary hearing in either state or federal court and that each claim depends upon facts outside the trial record and cannot be resolved without a full evidentiary hearing. Cartwright contends that the Oklahoma Court of Criminal Appeals in Cartwright v. State, 708 P.2d 592 (Okl.Cr.1985), erroneously interpreted and applied the holding in Ake to the facts in his case. We disagree.
 
 
 72
 We note that in Marshall v. Lonberger, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983), the Supreme Court held that a federal district court in a Sec. 2254 habeas corpus proceeding must respect the contents of state court records and findings that the petitioner was competent to stand trial and represented by competent counsel, and all inferences fairly deducible from these facts.
 
 
 73
 We have previously noted that Cartwright did not present an insanity defense. One of his defenses, however, although not expressly pled, was the defense of unconsciousness, resulting from the alleged "blackout." Tit. 21, Okl.Stat. Sec. 152(6) (1984) provides that a person is not capable of committing a crime who is not conscious of the act. In Foster v. State, 657 P.2d 166, 171 (Okl.Cr.1983), the court identified this defense:
 
 
 74
 The defense of unconsciousness may be used in situations where otherwise criminal conduct of an individual is the result of an involuntary act which is completely beyond the knowledge and control of that individual. The defense is totally separate from the defense of insanity. Jones v. State, 648 P.2d 1251 (Okl.Cr.1982).
 
 
 75
 In the case at bar, the trial court instructed the jury, under Instruction No. 3, that the deliberate intent to take human life must be formed before the act, and must exist at the time a homicidal act is committed; further, that external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. (R., Vol. I, p. 579). Thus, the jury was advised that Cartwright's mental capacity was an issue to be resolved in terms of specific intent to kill.
 
 
 76
 Under Oklahoma law, a defendant who invokes the defense of unconsciousness is not required to present evidence of mental disease or defect; rather, he must demonstrate that the criminal conduct resulted from an involuntary act completely beyond his knowledge and control. Jones v. State, 648 P.2d 1251 (Okl.Cr.1982). An instruction on the defense of unconsciousness should not be given where "[T]he record is devoid of any evidence other than vague statements by witnesses that a defendant was not acting normally ..." Foster v. State, 657 P.2d 166, 171 (Okl.Cr.1983). In the instant case, no instruction on the defense of unconsciousness was requested. In any event, in Oklahoma an instruction on a theory of defense need not be given if the evidence does not support the theory. Foster v. State, supra; Martley v. State, 519 P.2d 544 (Okl.Cr.), cert. denied, 419 U.S. 863, 95 S.Ct. 116, 42 L.Ed.2d 99 (1974). The above rule is in harmony with the rule in Caldwell v. Mississippi, supra, 105 S.Ct. at 2637, n. 1, that a defendant who seeks psychiatric assistance must make more than simple assertions that such assistance would be beneficial. It is our view that the letter from Dr. Kit Farwell, proferred with counsel's affidavit and motion for evidentiary hearing, falls short of the preliminary showing of the need of psychiatric assistance required under Ake. Insofar as the need for an evidentiary hearing on the claim that Cartwright's appointed trial counsel was ineffective, we have adequately addressed that issue. The contention is without merit.
 
 
 77
 Both claims are unsupported by substantial showings. The claims are, based on the record as a whole, conclusory and unsupported by specifics. In our view, the federal district court did not err in denying the motion for an evidentiary hearing.
 
 IV.
 
 78
 Cartwright contends that he was deprived of his right to a fair and impartial jury which represented a cross-section of the community in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, this contention is based on the trial court's systematic exclusion of jurors opposed to the death penalty. The record reflects that three prospective jurors were dismissed when they stated that they could not assent to imposition of the death penalty.
 
 
 79
 The issue was rendered moot by the United States Supreme Court's decision in Lockhart v. McCree, --- U.S. ----, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Court there held that the Constitution does not prohibit removal for cause, prior to the guilt phase of a bifurcated capital punishment trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair their performance of duties as jurors at the sentencing phase of the trial. The Court concluded that the so-called "death qualification" of the jury does not violate the requirement for a fair cross section under the Sixth Amendment.
 
 V.
 
 80
 Cartwright challenges the Oklahoma death penalty statute, Tit. 21, Okl.Stat. Sec. 701.12 (1981), which authorizes the jury to impose the death penalty for murder when an aggravating circumstance is found. One of the aggravating circumstances enumerated in the statute provides that when the murder is "especially heinous, atrocious, or cruel" death may be imposed. Tit. 21, Okl.Stat. Sec. 701.12(4). Cartwright argues that this aggravating circumstance is vague and overly broad. In the second prong of his challenge Cartwright argues that the Oklahoma Court of Criminal Appeals' interpretation of this language and its application in his case is also unconstitutional.
 
 
 81
 The statutory language--"especially heinous, atrocious, or cruel"--has been subjected to scrutiny by the United States Supreme Court in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). The defendant there, like Cartwright, alleged that the statutory language was "so vague and so broad that virtually 'any capital defendant becomes a candidate for the death penalty'...." Id. at 255, 96 S.Ct. at 2968. In analyzing the challenge, however, the Supreme Court considered the validity of the statute by examining how it had been construed by the Florida Supreme Court.
 
 
 82
 That court has recognized that while it is arguable "that all killings are atrocious, ... [s]till, we believe that the Legislature intended something 'especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder." Tedder v. State, 322 So.2d, at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." State v. Dixon, 283 So.2d, at 9. See also Alford v. State, 307 So.2d 433, 445 (1975); Halliwell v. State, supra, [323 So.2d 557] at 561.
 
 
 83
 Proffitt at 255-56, 96 S.Ct. at 2968. On the basis of the Florida court's construction, usage of the statutory language "especially heinous, atrocious or cruel" was upheld as providing adequate guidance to a jury.
 
 
 84
 Based on our reading of footnote 12 in Proffitt we believe that while the "unnecessarily torturous to the victim" language is indeed an element of "especially heinous, atrocious, and cruel" it need not be included in an instruction. However, the reviewing court must include it in its evaluation of the evidence in capital cases where this aggravating circumstance has been found. After concluding that the Florida Supreme Court has directed the especially heinous, atrocious, and cruel language "only at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim' ", the Supreme Court, at footnote 12, stated:
 
 
 85
 The Supreme Court of Florida has affirmed death sentences in several cases, including the instant case, where this eighth statutory aggravating factor was found, without specifically stating that the homicide was "pitiless" or "torturous to the victim."
 
 
 86
 * * *
 
 
 87
 * * *
 
 
 88
 But the circumstances of all of these cases could accurately be characterized as "pitiless and "unnecessarily torturous," and it thus does not appear that the Florida Court has abandoned the definition that it announced in Dixon and applied in Alford, Tedder, and Halliwell.
 
 
 89
 Proffitt, 428 U.S. at 256, n. 12, 96 S.Ct. at 2968, n. 12 (citations omitted).
 
 
 90
 After Proffitt the Oklahoma Legislature enacted 21 O.S. Sec. 701.12. The Oklahoma Legislature adopted the statutory language "heinous, atrocious, or cruel"--the identical Florida statutory language upheld in Proffitt--as an aggravating circumstance authorizing the imposition of the death penalty. The language was challenged in the Oklahoma State Court system. The Oklahoma Court of Criminal Appeals upheld the validity of this language, expressly adopting the Florida Supreme Court's construction in State v. Dixon, upheld in Proffitt:
 
 
 91
 [W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accomplished by such additional acts as to set the crime apart from the norm of capital felonies, the conscienceless or pitiless crime, which is unnecessarily torturous to the victim. (Emphasis Supplied.)
 
 
 92
 Eddings v. State, 616 P.2d 1159, 1167-68 (Okl.Cr.1980), rev'd on other grounds, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Chaney v. State, 612 P.2d 269, 280 (Okl.Cr.1980), cert. denied, 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981). See also the following cases which favorably cite the State v. Dixon language: Irvin v. State, 617 P.2d 588, 598 (Okl.Cr.1980); Odum v. State, 651 P.2d 703, 706 (Okl.Cr.1982); Boutwell v. State, 659 P.2d 322, 329 (Okl.Cr.1983); Davis v. State, 665 P.2d 1186, 1202 (Okl.Cr.), cert. denied, 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983); Stafford v. State, 665 P.2d 1205, 1217 (Okl.Cr.1983), vacated on other grounds, 467 U.S. 1212, 104 S.Ct. 2651, 81 L.Ed.2d 359 (1984), aff'd., 700 P.2d 223 (Okl.Cr.), cert. denied, --- U.S. ----, 106 S.Ct. 188, 88 L.Ed.2d 157 (1985); Nuckols v. State, 690 P.2d 463, 471-72 (Okl.Cr.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); and Green v. State, 713 P.2d 1032, 1044 (Okl.Cr.1985).[2]
 
 
 93
 In Cartwright's case the jury was charged with Oklahoma Uniform Jury Instruction--Cr. No. 436 which provided: " 'heinous' means extremely wicked or shockingly vile; 'atrocious' means outrageously wicked or vile; 'cruel' means pitiless or utter indifference to, or enjoyment of, the sufferings of others pitiless." This language tracks State v. Dixon exactly and indicates that Oklahoma chose to copy Florida's language and follow the construction supplied by the Florida court.
 
 
 94
 Oklahoma has clearly adopted the unnecessarily torturous element through its wholesale adoption of the Florida Supreme Court's construction of "heinous, atrocious or cruel" in State v. Dixon, approved by the United States Supreme Court. While the "unnecessarily torturous to the victim" language need not be a part of the formal jury instruction, see, Irvin v. State, supra at 598-99, the facts of any capital case must be weighed against this standard on appellate review. Therefore, the appellate court's construction of the elements of the aggravating circumstance is crucial. Oklahoma law specifically requires appellate courts to determine whether the evidence supports the finding of a statutory aggravating circumstance. 21 O.S. Sec. 701.13(C)(2).
 
 
 95
 Our concern then becomes whether the Oklahoma Court of Criminal Appeals has been consistent in its construction of the "especially heinous, atrocious, or cruel" aggravating circumstance. Such consistency is required by Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In Godfrey the jury was instructed with nothing more than the bare statutory language. No definitions were included. The problem was not the language itself, inasmuch as it had been approved in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The problem involved the summary application of the language by the court. On appeal, the Georgia Supreme Court affirmed the death sentence without applying a construction of the statutory language which included the objective standards of torture, depraved mind, or aggravated battery which the Georgia court had previously declared to be elements of that construction. This lack of standards and inconsistent construction was condemned in Godfrey, supra, 427-33, 100 S.Ct. at 1764-67. In Cartwright v. State, supra at 554, the court said:
 
 
 96
 According to the plurality in Godfrey v. Georgia, the Georgia Supreme Court had defined the aggravating circumstance that the murder was 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim' essentially to mean that torture must have been involved in the murder. (Citation omitted.) This court has not defined the 'especially heinous atrocious or cruel' aggravating circumstance in such a manner.... While it is true that torture may be a sufficient factor to justify a finding that the murder was especially heinous, atrocious, or cruel ... it is not a necessary one. (Underlining supplied.)
 
 
 97
 This holding of the Oklahoma Court of Criminal Appeals must be juxtaposed against that court's statement some nine months later in Green v. State, supra. The court there repeated the passage from State v. Dixon, supra, including the construction expressly approved in Proffitt: "What is intended to be included are those capital crimes where the actual commission of the capital felony was accomplished by such additional acts as to set the crime apart from the norm of capital felonies, the conscienceless or pitiless crime, which is unnecessarily torturous to the victim." (Emphasis supplied.) Green, supra at 1044, quoting State v. Dixon, supra. The Green court then stated, "We have consistently adhered to this definition of 'especially heinous, atrocious, or cruel.' " Green at 1044.
 
 
 98
 The pronouncement by the court in Cartwright, i.e., that the condemned acts need not be found to be "unnecessarily torturous to the victim," must be contrasted against prior and subsequent constructions, which, while often not expressly stating that the defendant's conduct was "unnecessarily torturous to the victim," can be characterized as such upon a review of the evidence. Proffitt, supra, at 255-56, n. 12, 96 S.Ct. 2968, n. 12. See Odum v. State, supra (where the conviction was reversed because the victim died instantly from a single shotgun blast to the neck; the court held, "There was no evidence of any physical or mental suffering whatsoever and the manner of killing cannot be said to lie at the 'core' of the statutory aggravating circumstance." 651 P.2d at 707). See also, Burrows v. State, 640 P.2d 533 (Okl.Cr.1982), cert. denied, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 480 (1983), (where the defendant killed his pregnant wife in front of their young son. He repeatedly fired shots into his wife as she tried to flee down the hallway.); Irvin v. State, supra (where the victim, a former co-employee of the defendant, was shot five times following an apparent robbery); Davis v. State, supra (where a mass-murder was perpetrated by multiple gunshot wounds to the victims). In each of these cases the same jury instruction was given. However, the standard of review had changed in Cartwright v. State, supra at 554.
 
 
 99
 Even though it is our view that the Oklahoma Court of Criminal Appeals has not been consistent in its construction, we nevertheless conclude that this departure is harmless because once the evidence is measured against the correct standard it is clear that the killing of Hugh Riddle satisfies the test. Under Oklahoma law this aggravating circumstance encompasses a number of factors in addition to "torturous to the victim": the manner of killing, the circumstances surrounding the homicide, and the killer's attitude. Nuckols v. State, supra at 472 (citations omitted). This combination of factors was in fact used by the Oklahoma Court of Criminal Appeals in considering whether Cartwright's case met the aggravating circumstance:
 
 
 100
 In assessing whether the murder was especially heinous, atrocious or cruel, the appellant would have us consider the shooting as an isolated event, to-wit: that the appellant walked into a room and shot Hugh Riddle at close range with a shotgun killing him almost immediately.
 
 
 101
 * * *
 
 
 102
 * * *
 
 
 103
 Therefore, we decline to consider this murder as though it occurred in a vacuum. We deem it proper to gauge whether the murder was heinous, atrocious or cruel in light of the circumstances attendant to the murder, including the evidence that the appellant had previously expressed his intentions to "get even" with the Riddles; that he probably had been inside the Riddles' home as early as 11:13 a.m. on the day of the murder; that he either lay in wait for them, or returned under the cover of darkness, and broke into their home to stalk them; that he attacked Charma immediately upon being discovered; that having gunned her down, he went into the living room and slayed Hugh; that Hugh doubtless heard the shotgun blasts which tore through Charma's body; that he quite possibly experienced a moment of terror as he was confronted by the appellant and realized his impending doom; that the appellant again attempted to kill Charma in a brutal fashion upon discovery that his first attempt was unsuccessful; that he attempted to conceal his deeds by disconnecting the telephone and posting a note on the door; and that his apparent attempt to steal goods belonging to the Riddles by loading them in their vehicle was prevented only the arrival of the police officers, adequately supported the jury's finding.
 
 
 104
 Cartwright, 695 P.2d at 553-54.
 
 
 105
 All of the factors surrounding a killing, including suffering, manner of killing, and the killer's attitude have been considered by the Oklahoma Court of Criminal Appeals in determining whether it is torturous to the victim. Our independent evaluation of the evidence supports the conclusion of the Oklahoma Court of Criminal Appeals that Cartwright's acts were unnecessarily torturous to Hugh Riddle.
 
 
 106
 Cartwright also challenges the trial court's instruction of the separate aggravating circumstance of "knowingly created a great risk of death to more than one person," Okl.Stat.Ann.Tit. 21 Sec. 701.12(2), as overly broad in that it failed to adequately instruct the jury regarding the meaning of that language, thus creating the possibility of an overbroad interpretation by the jury. This challenge also must fail.
 
 
 107
 In Proffitt, supra, an aggravating circumstance using language very similar to Oklahoma's,[3] was challenged for vagueness. The Court once again looked to the construction applied by the state courts to determine if the language was impermissibly vague. By examining only the construction the Court impliedly upheld use of the statutory language in jury instructions. Proffitt, supra, at 256, 96 S.Ct. at 2968. In Alabama v. Evans, 461 U.S. 230, 103 S.Ct. 1736, 75 L.Ed.2d 806 (1983), the Court again entertained a challenge to this aggravating circumstance and held that "aggravating factors must be construed and applied in a nonarbitrary manner." Evans, supra, at 233, 103 S.Ct. at 1738, citing Godfrey v. Georgia, supra. Thus, if the Oklahoma court has applied a consistent construction to the language and if the aggravating circumstance is supported by the evidence in this case, there is no constitutional infirmity.
 
 
 108
 A review of Oklahoma death penalty cases shows that this aggravating circumstance has been construed consistently. It is clear that the Oklahoma court has not required "the great risk of death to more than one person" to occur in a public place or to be directed only at those who become fatalities. See, Stout v. State, 693 P.2d 617 (Okl.Cr.1984), cert. denied, --- U.S. ----, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985), (the defendant killed two people by beating them to death in their bedroom; it does not appear that anyone else was present); Tobler v. State, 688 P.2d 350 (Okl.Cr.1984) (two brothers, also alone in their home were murdered at close range with a shotgun); Robinson v. State, 677 P.2d 1080 (Okl.Cr.), cert. denied, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984), (all three victims were murdered in their home in an attempted robbery); and Dutton v. State, 674 P.2d 1134 (Okl.Cr.), cert. denied 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 850 (1984) (the defendant killed one person and injured another while robbing a bar). See also, Ross v. State, 717 P.2d 117 (Okl.Cr.1986) (where the danger was found to be present even though only one police officer was killed because the defendant threatened another person with death if she did not cooperate with him; the court found that the defendant's actions showed he intended to carry through with his threats and clearly placed the woman's life in danger). Cartwright killed Hugh Riddle. He intended to kill Charma Riddle, and came very close to doing so. Measured against the evidence in this case we hold that Cartwright's conduct knowingly created a great risk of death for more than one person.
 
 
 109
 WE AFFIRM. In light of the fact that this is a capital case, following the consideration of any rehearing petition that may be filed, when the final order of this court is entered, or when the judgment becomes final without further order and issuance of the mandate of this court which would otherwise occur, we will stay our mandate and execution of petitioner's death warrant for thirty days pending the filing of a petition for certiorari in the Supreme Court of the United States; if such a petition for certiorari is filed within such time, then the stay of our mandate and of petitioner's execution will continue until disposition by the Supreme Court of the petition for certiorari.
 
 
 110
 TACHA, Circuit Judge, specially concurring.
 
 
 111
 I fully concur in Sections I through IV of the majority opinion. I also concur in much of the discussion in Section V concerning Oklahoma's application of the "especially heinous, atrocious, and cruel" aggravating circumstance. I write separately because in my opinion it is constitutionally inappropriate to rely, as the majority does, on all of the circumstances surrounding a killing as factors in determining that a murder is "especially heinous, atrocious, and cruel." Rather, I concur on the basis of the single circumstance present in this case of suffering of a surviving victim.
 
 
 112
 In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court in effect invalidated the death penalty statutes of almost all states having such statutes because the death penalty was being imposed in an arbitrary and capricious manner. In an effort to limit the discretion of juries deciding whether to impose the death penalty, Florida responded to Furman by specifying a series of aggravating circumstances, at least one of which had to be found before the death penalty could be imposed. One of these aggravating circumstances was that the murder was "especially heinous, atrocious, and cruel." The Florida Supreme Court recognized that arguably all killings are atrocious and directed that the statutory provision be applied only to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). In Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2930, 2938, 49 L.Ed.2d 913 (1976), the Supreme Court found that this construction of the statutory provision adequately focused the jury's consideration.
 
 
 113
 On the same day that Proffitt was decided, the Court in Gregg v. Georgia, 428 U.S. 153, 200-03, 96 S.Ct. 2909, 2937-39, 49 L.Ed.2d 859 (1976), held that an aggravating circumstance in the Georgia statute that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim" was not invalid on its face because such language could be construed to satisfy constitutional requirements. The Georgia courts' application of the aggravating circumstance found not facially invalid in Gregg was reviewed by the Supreme Court in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Justice Stewart writing for a plurality of the Court observed:
 
 
 114
 [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.... It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death."
 
 
 115
 Id. at 428, 100 S.Ct. at 1764 (footnotes omitted).[1] In prior cases, the Georgia state courts applied a narrowing construction of the statutory language "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." In Godfrey, however, the state courts failed to apply that narrowing construction. Therefore, the plurality undertook its own review of the factual circumstances. In Godfrey, the defendant killed his wife with one blast from a shotgun, struck his eleven-year-old daughter with the barrel of the gun, and then killed his mother-in-law with another blast from the shotgun. Id. at 424-26, 100 S.Ct. at 1763. The question asked by the plurality was "whether, in light of the facts and circumstances of the murders ..., the Georgia Supreme Court can be said to have applied a constitutional construction" of the statutory phrase. Id. at 432, 100 S.Ct. at 1766. The plurality concluded that "[t]here is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." Id. at 433, 100 S.Ct. at 1767. Accordingly, the Court reversed the finding that the murders were "outrageously or wantonly vile, horrible or inhuman in that [they] involved torture, depravity of mind, or an aggravated battery to the victim[s]."
 
 
 116
 It is against this background that we consider Oklahoma's application of the "especially heinous, atrocious, and cruel" aggravating circumstance. Reviewing the Oklahoma cases, the majority opinion correctly concludes that it is the duty of an appellate court reviewing a finding of "especially heinous, atrocious, and cruel" to determine if the murder was "unnecessarily torturous to the victim." Eddings v. State, 616 P.2d 1159, 1167-68 (Okla.Crim.App.1980), rev'd on other grounds, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting the Florida Supreme Court in State v. Dixon, 283 So.2d at 9). This is the same construction of "especially heinous, atrocious, and cruel" that the Supreme Court approved in Proffitt. 428 U.S. at 255-56, 96 S.Ct. at 2938.
 
 
 117
 But the Oklahoma court did not apply the "unnecessarily torturous to the victim" standard in this case. Instead, the state court "deem[ed] it proper to gauge whether the murder was heinous, atrocious, or cruel in light of the circumstances attendant to the murder." Cartwright v. State, 695 P.2d 548, 554 (Okla.Crim.App.), cert. denied, --- U.S. ----, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985). The court then described the petitioner's motive for the murder, the preparation for the attack, the attack itself, and the petitioner's efforts to conceal his activities. Such reliance on all of the events surrounding a murder fails to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " Godfrey, 446 U.S. at 428, 100 S.Ct. at 1764 (footnotes omitted). Many of the circumstances recited by the state court in this case do not "distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." Godfrey, 446 U.S. at 433, 100 S.Ct. at 1767. Indeed, with one exception, the facts of Godfrey are remarkably similar to the facts in this case. In both instances the murder victims died almost instantly from a single blast fired from a shotgun. The one exception, however, is crucial. The surviving victim in Godfrey did not suffer any of the torture that Charma Riddle experienced in this case. The question then becomes whether it is constitutional to consider the suffering of a surviving victim in determining whether a murder is "especially heinous, atrocious, and cruel."
 
 
 118
 In my opinion, it does not strain the meaning of "especially heinous, atrocious, and cruel" to consider the suffering inflicted on a surviving victim during a murderous attack. A narrow inquiry into the suffering of a surviving victim serves to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance.' " Godfrey, 446 U.S. at 428, 100 S.Ct. at 1764. The presence of this particular circumstance serves to distinguish this type of murder from other murders. Therefore, in my opinion, a construction of the language "especially heinous, atrocious, and cruel" which includes consideration of the suffering of a surviving victim is constitutional.
 
 
 119
 Furthermore, even though the Oklahoma Court of Criminal Appeals has not directly addressed the issue of whether the suffering of a surviving victim can be considered in determining whether a murder is "especially heinous, atrocious, and cruel," it has relied upon such suffering in three instances in which a murder was found to be "especially heinous, atrocious, and cruel." In Jones v. State, 648 P.2d 1251 (Okla.Crim.App.1982), cert. denied, 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983), the defendant shot and injured a woman, shot and injured a man, and shot and killed the injured man's father. The defendant, realizing that the first man was still alive, then shot him again as he lay wounded. The injured man survived this attack. The Oklahoma court relied on the attack on the surviving victim in upholding a finding that the murder was "especially heinous, atrocious, and cruel." Id. at 1259. In the two other cases the Oklahoma court did not distinguish between the suffering of the murder victim and the suffering of the surviving victim in upholding a finding that the murder was "especially heinous, atrocious, and cruel." Davis v. State, 665 P.2d 1186, 1202-03 (Okla.Crim.App.), cert. denied, 464 U.S. 865, 104 S.Ct. 203, 78 S.Ct. 177 (1983); Ake v. State, 663 P.2d 1, 11 (Okla.Crim.App.1983), rev'd on other grounds, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).[2]
 
 
 120
 In the present case, the petitioner shot Charma Riddle, killed Hugh Riddle, and then repeatedly slashed Charma Riddle as she sought help. The mere fortunate happenstance that Charma Riddle survived this attack should not operate to relieve the petitioner from the conclusion that the murder was "especially heinous, atrocious, and cruel." Hugh Riddle did not suffer greatly before his death because he was killed almost instantly, but the suffering endured by Charma Riddle can certainly be described as torturous. This suffering, and not any of the other circumstances relied upon by the state court, support the conclusion that the murder of Hugh Riddle was "especially heinous, atrocious, and cruel."
 
 
 121
 I therefore concur in the judgment of the court.
 
 
 
 [1]
 The record does not contain a statement of the exact amount of the medical bill, but it is undisputed that the amount was small
 
 
 [2]
 Other Oklahoma cases which have considered a challenge to this language do not cite State v. Dixon directly but do cite Oklahoma cases which have adopted the language. See, Cartwright v. State, 695 P.2d 548, 554 (Okl.Cr.1985) and Liles v. State, 702 P.2d 1025, 1031-32 (Okl.Cr.1985), cert. denied, --- U.S. ----, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986)
 
 
 [3]
 In Proffitt, supra at 255-56, 96 S.Ct. at 2968, the Court reviewed Fla.Stat.Ann. Sec. 921.141(5)(c) (Supp.1976-1977) which provided, "[t]he defendant knowingly created a great risk of death to many persons."
 
 
 [1]
 Justices Marshall and Brennan concurred in the judgment, reiterating their belief that "the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments." Godfrey, 446 U.S. at 433, 100 S.Ct. 1767
 
 
 [2]
 In contrast the Florida courts, from which Oklahoma adopted the "unnecessarily torturous to the victim" standard, have expressly held that the suffering of a surviving victim is not a proper consideration in deciding whether a murder is "especially heinous, atrocious, and cruel." Clark v. State, 443 So.2d 973, 977 (Fla.1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 356 (1984); Riley v. State, 366 So.2d 19, 21 (Fla.1978)